**DETROIT FREE PRESS,**
**et al., Plaintiffs,**

v.

**John ASHCROFT, et al., Defendants.**

**Nos. 02–70339, 02–70340.**

United States District Court,
E.D. Michigan,
Southern Division.

April 3, 2002.

---

Herschel P. Fink, Brian D. Wassom, Honigman, Miller, Detroit, MI, for Detroit Free Press, Inc.

Jonathan D. Rowe, Soble & Rowe, Ann Arbor, MI, for Herald Co., Inc.

L. Michael Wicks, U.S. Attorney's Office, Detroit, MI, Thankful L. Vanderstar, U.S. Dept. of Justice, Office of Immigration Lit., Washington, DC, for defendants.

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION [2–1] AND DENYING DEFENDANTS' MOTION TO DISMISS COMPLAINT FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED [10–1][1]

EDMUNDS, District Judge.

In the wake of the horrific events of September 11, 2001, the United States

---

1. The parties have filed numerous pleadings in these matters. For ease, the pleadings relevant to this Order will be referenced as follows: (1) Haddad's motion for preliminary injunctive relief ("Haddad's Motion"); (2) Detroit Free Press Plaintiffs' motion for injunctive relief ("Free Press' Motion"); (3) Detroit News Plaintiffs' motion for injunctive and declarative relief ("Detroit News' Motion"); (4) Government's response to the Detroit Free Press Plaintiffs' and Detroit News Plaintiffs' motions and motion to dismiss complaint for failure to state a claim upon which relief can be granted ("Government's 12(b)(6) Motion as to the Newspaper Plaintiffs"); (5) Detroit News Plaintiffs' response to Government's 12(b)(1) motion and reply to Government's response and 12(b)(6) motion ("Detroit News' Reply"); (6) Detroit Free Press Plaintiffs' reply to Government's response and 12(b)(6) motion and response to Government's 12(b)(1) motion ("Free Press' Reply"); (7) Government's reply brief in support of 12(b)(6) motion in reply to Free Press' and Detroit News' replies ("Government's SurReply").

Government launched an extensive, broad-based investigation into the terrorist attacks and other potential threats to United States citizens and interests. As part of that investigation, the Government has identified, questioned, and instituted removal proceedings against a number of non-citizens, primarily young men of Arab or Muslim background. These proceedings have been closed to the press and public.

Arguing that the closure of these hearings is unconstitutional, plaintiffs in three separate cases seek an injunction against such procedure in any future hearings. Arguing that this Court lacks jurisdiction and that no constitutional rights are abridged by the exclusion of the press and public from the hearings, the Government asks that the cases be dismissed, or, in the alternative that the Court apply a deferential level of scrutiny to the Government's action.

Although the structure of the Government's argument is built on statutory interpretation, jurisdiction, and administrative procedures, the subtext is all about the Government's right to suspend certain personal liberties in the pursuit of national security. In this regard, plaintiffs have responded with a citation to *Duncan v. Kahanamoku,* 327 U.S. 304, 329–30, 66 S.Ct. 606, 90 L.Ed. 688 (1946)(Murphy, J., concurring), in which Justice Murphy condemned constitutional violations made in the wake of the attack on Pearl Harbor:

> We may assume that the threat to Hawaii was a real one; we may also take it for granted that the general declaration of martial law was justified. But it does not follow from these assumptions that the military was free [to violate the] Constitution ... especially after the initial shock of the sudden Japanese attack had been dissipated.

> From time immemorial despots have used real or imagined threats to the public welfare as an excuse for needlessly abrogating human rights. That excuse is no less unworthy of our traditions when used in this day of atomic warfare or at a future time when some other type of warfare may be devised. The ... constitutional rights of an accused individual are too fundamental to be sacrificed merely through a reasonable fear of military assault. There must be some overpowering factor that makes a recognition of those rights incompatible with the public safety before we should consent to their temporary suspension.

For the reasons stated below, this Court agrees that it has jurisdiction to hear these cases, and that the blanket closure of the removal hearings in "special interest" cases is unconstitutional.[2]

## I. The Parties

Members of the press and public filed two of the cases challenging the Government's closure of removal proceedings. The plaintiffs in those cases are (1) the Detroit Free Press, Inc. and Herald Co., Inc. (d/b/a the Ann Arbor News)(the "Free Press Plaintiffs") and (2) the Detroit News, Inc., Congressman John Conyers, Jr., and Metro Times, Inc. (the "Detroit News Plaintiffs")(collectively the "Newspaper Plaintiffs").[3] The third case was filed

---

2. The Court is issuing a separate opinion addressing its jurisdiction over these matters. As well, the Court will address Haddad's motion for preliminary injunction and the Government's corresponding motion to dismiss his complaint for failure to state a claim upon which relief can be granted in a subsequent order.

3. The Court issued an Order on March 5, 2002, consolidating the Newspaper Plaintiffs' lawsuits. In the same Order, the Court consolidated Haddad's and the Newspaper Plaintiffs' cases for pretrial matters.

by Rabih Haddad ("Haddad"), one of the men against whom the Government has instituted removal proceedings.[4] The defendants in all of the cases are Attorney General John Ashcroft, Chief Immigration Judge Michael Creppy, and Immigration Judge Elizabeth Hacker (collectively "the Government").

## II. Factual Background

Haddad, a native of Lebanon, resided in Ann Arbor, Michigan off-and-on since 1988.[5] *See* Haddad Mot. ¶ 4. Haddad and his family most recently came to the United States in 1998 on six-month tourist visas.[6] *See id.* Ex. A ¶ 3. On December 14, 2001, the United States Immigration and Naturalization Service ("INS") took Haddad into custody for overstaying his visa and initiated removal proceedings in Detroit before Immigration Judge Elizabeth Hacker. *See id.* ¶¶ 5 & 7.

On September 21, 2001, prior to Haddad's arrest, Chief Immigration Judge Michael Creppy issued a directive (the "Creppy directive") to all United States Immigration Judges mandating that they close immigration proceedings to the press and public (including family members of the deportee) in certain "special interest" cases identified by the Office of the Chief Immigration Judge. *See* Haddad Mot. ¶ 6. Chief Immigration Judge Creppy issued this directive under United States Attorney General John Ashcroft's authorization. *See id.* ¶ 8.

On December 19, 2002, Immigration Judge Hacker conducted a bond hearing in Haddad's case. *See* Haddad Mot. ¶ 16. Haddad's family, members of the public, and the Newspaper Plaintiffs sought to attend the hearing. *See id.* However shortly before the hearing began, and without prior notice to Haddad or his counsel, courtroom security officers announced that the hearing was closed to the press and public. *See id.* Haddad objected to the closure of his hearing. *See id.* ¶ 18. Immigration Judge Hacker stated that the decision to close the proceedings came from her supervisors and that she lacked the power to reverse the decision. *See id.* Following the December 19 hearing, Judge Hacker denied bail and ordered Haddad detained. *See id.* ¶ 22. Subsequent hearings, conducted on January 2 and 10, 2002, also were closed to the press and public. *See* Detroit Free Press Mot. at 4 ¶¶ 10 & 11. Haddad remains in detention and has been transferred to Chicago for additional proceedings. *See* Haddad Mot. ¶¶ 29 & 31. The next hearing in his case is scheduled for April 10, 2002.

In response to the closure, Haddad and the Newspaper Plaintiffs filed their complaints for injunctive and declaratory relief against the Government. Haddad claims that the Government's actions violate his rights under (1) the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et seq.;* (2) the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et sq., and the regulations promulgated thereunder, 8 C.F.R. §§ 3.27 & 240.10; and (3) the Due Process Clause of the Fifth Amendment of the United States Constitution. The Newspaper Plaintiffs claim that they have a right of access to such hearings pursuant to the First Amendment of the United

---

4. *See Rabih Haddad v. John Ashcroft, et al.,* 195 F.Supp.3d 948 (E.D.Mich.2002).

5. Haddad resided in Ann Arbor with his wife and their four children, one of whom was born in the United States (and is therefore a citizen). *See* Haddad Mot. ¶ 9.

6. Haddad and his family have applied with the Immigration and Naturalization Service ("INS") for extensions of their visas. *See* Haddad Mot. Ex. A ¶ 3. On April 30, 2001, Haddad also applied for alien labor certification, in order to adjust his status to permanent residency. *See id.*

States Constitution, as well as statutory and regulatory law. The Newspaper Plaintiffs seek a declaratory judgment that the Creppy directive, facially and as applied, violates their right of access. They additionally request a preliminary injunction enjoining the Government from closing future proceedings related to Haddad and requiring it to produce transcripts of all previously held proceedings and copies of all documents related to Haddad's case.

### III. Applicable Law

To determine whether to grant a motion for preliminary injunction, a court must analyze the following four factors:

(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir.2001). The primary issue in this case, and on which the parties focus their pleadings, is whether the Newspaper Plaintiffs have a strong likelihood of success on the merits. Resolution of this issue rests upon whether the First Amendment of the United States Constitution confers upon the Newspaper Plaintiffs a right of access to removal proceedings.

### A. The Likelihood of the Newspaper Plaintiffs' Success on the Merits: Whether the Newspaper Plaintiffs Have a First Amendment Right of Access to Haddad's Removal Proceedings

Since 1979, the Supreme Court has decided numerous cases addressing the press' right of access to various types of proceedings. *See, e.g., Gannett Co. v. DePasquale*, 443 U.S. 368, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979); *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 100 S.Ct. 2814, 65 L.Ed.2d 973 (1980); *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982); *Press–Enterprise Co. v. Superior Court*, 464 U.S. 501, 104 S.Ct. 819, 78 L.Ed.2d 629 (1984)("*Press–Enterprise I*"); *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984); *Press–Enterprise Co. v. Superior Court*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986)("*Press–Enterprise II*"). In analyzing the press' First Amendment claims of access in these cases, the Supreme Court considered two factors: "First the proceeding must be one for which there has been a 'tradition of accessibility'" and "[s]econd, public access must play a 'significant positive role in the function of the particular process in question.'" *Cincinnati Gas and Elec. Co. v. General Elec. Co.*, 854 F.2d 900, 903 (6th Cir.1988)(citing *Press–Enterprise II*, 478 U.S. at 8–9, 106 S.Ct. 2735). In *Press–Enterprise II*, the Court explained that the first element requires a determination as to "whether the place and process [to which access is sought] has historically been open to the press and general public." *Id.* Invoking this analysis, courts consistently have found a right of access to civil proceedings and quasi-judicial administrative proceedings. *See, e.g., Brown & Williamson Tobacco Corp. v. FTC*, 710 F.2d 1165 (6th Cir.1983)(finding right of access to documents in civil proceeding); *Fitzgerald v. Hampton*, 467 F.2d 755 (D.C.Cir.1972)(finding right of access to Civil Service Commission removal hearing); *Soc'y of Prof'l Journalists v. Sec'y of Labor*, 616 F.Supp. 569 (D.Utah 1985)(finding right of access to Mine Safety and Health Administration investigative hearing), *vacated as moot*, 832 F.2d 1180 (10th Cir.1987); *Pechter v. Lyons*, 441 F.Supp. 115 (S.D.N.Y.1977)(holding that immigration judge abused his discretion in excluding public from deportation hearing).

### 1. Historical Tradition of Accessability to Removal Hearings

The statutory and regulatory history of immigration law demonstrates a tradition of public and press accessibility to removal proceedings. From the start of the federal government's regulation of immigration in the last quarter of the nineteenth century, the governing statutes and regulations have expressly closed exclusion hearings (i.e. hearings to determine whether an alien may enter the United States), but have *never* closed deportation hearings (i.e. hearings to determine whether an alien already within the country may remain and, if so, under what conditions).[7] In fact, INS regulations for almost fifty years have mandated that deportation proceedings be presumptively open. *See* 8 C.F.R. § 3.27.

Time and again, Congress has enacted legislation explicitly closing exclusion hearings. *See, e.g.,* Treasury Department, Immigration Laws and Regulations 4 (Washington D.C., Government Printing Office 1893); Act of March 3, 1903 § 25 (Ch. 1012, 32 Stat. 1213)(requiring exclusion hearings to be held "separate and apart" from the public); 1952 Immigration and Nationality Act, 66 Stat. 163, Section 236 (same); *see also* Detroit News' Reply at 10 n. 4. Yet in none of these statutes has Congress included language to require the closure of deportation hearings. And even though the INS repeatedly has promulgated regulations specifically mandating a presumption of openness, Congress has continued to remain silent on the issue of whether deportation hearings should be open or closed to the public. *See, e.g.,* 8 C.F.R. § 242.12(a) (1965)(providing that deportation hearings shall be presumptively open to the public); 8 C.F.R. § 242.16 (1994)(same). Consistent with Congress' silence in its immigration statutes and INS regulations requiring deportation hearings to be presumptively open, such hearings traditionally have been open to the press and public.

### 2. Procedural Importance of Openness

 The courts have identified a number of reasons why the public and press should be granted access to proceedings, whether the hearings are criminal, civil, or administrative in nature. *See, e.g., Globe Newspaper Co.,* 457 U.S. at 606, 102 S.Ct. 2613; *Richmond Newspapers, Inc.,* 448 U.S. at 592–93, 100 S.Ct. 2814; *Brown & Williamson Tobacco Corp.,* 710 F.2d at 1178–79; *Fitzgerald,* 467 F.2d at 764. In *Fitzgerald,* the Court of Appeals for the D.C. Circuit found a general policy favoring disclosure of administrative agency proceedings. *Fitzgerald,* 467 F.2d at 764. As the court stated:

> ... in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. These demand 'a fair and open hearing,' essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process ... when governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies

---

**7.** With the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress changed the nomenclature of exclusion and deportation proceedings. Both proceedings now are referred to as "removal" hearings. *See* 8 U.S.C. § 1229a. However, the historical distinction between aliens who already entered the United States and those who are outside its geographical borders remains significant, particularly in that aliens already within the United States are entitled to greater statutory and constitutional rights. *See Zadvydas v. Davis,* 533 U.S. 678, 121 S.Ct. 2491, 2500–01, 150 L.Ed.2d 653 (2001).

use the procedures which have traditionally been associated with the judicial process.

*Fitzgerald,* 467 F.2d at 765. Other courts also have described the procedural importance of openness in quasi-judicial administrative proceedings.

In *Pechter,* the District Court for the Southern District of New York stated:

> This regulation [that deportation proceedings shall be open to the public] is but one of countless manifestations of a public policy centuries old that judicial proceedings, especially those in which the life or liberty of an individual is at stake, should be subject to public scrutiny, not only for the protection of the individual from unwarranted and arbitrary conviction, but also to protect the public from lax prosecution . . .

*Pechter,* 441 F.Supp. at 117–18. The court further noted:

> "The right to a public trial is not only to protect the accused but to protect as much the public's right to know what goes on when men's lives and liberty are at stake . . .
>
> It is important that our citizens be free to observe court proceedings to insure a sense of confidence in the judicial process."

*Id.* at 118 (internal citations omitted). And in *Society of Professional Journalists,* which involved the press' challenge to the Mine Safety and Health Administration's decision to close formal hearings conducted to investigate a mine fire, the District Court for the District of Utah stated:

> An investigation into the causes of the disaster can create an emotional catharsis that soothes the community sorrow. If someone is responsible, people become aware of that. If no one is at fault, people can become reassured of that. Access to the proceedings, where feasible, ensures that people realize that justice is being done.

Moreover, openness ensures that [the agency] properly does its job.

*Soc'y of Prof'l Journalists,* 616 F.Supp. at 576.

■ The considerations the courts identified to support a right of access to the administrative proceedings at issue in *Fitzgerald, Pechter,* and *Society of Professional Journalists* apply as strongly to Haddad's deportation proceedings. Haddad's right to remain in the United States will be decided at these proceedings. It is important for the public, particularly individuals who feel that they are being targeted by the Government as a result of the terrorist attacks of September 11, to know that even during these sensitive times the Government is adhering to immigration procedures and respecting individuals' rights. Openness is necessary for the public to maintain confidence in the value and soundness of the Government's actions, as secrecy only breeds suspicion as to why the Government is proceeding against Haddad and aliens like him. And if in fact the Government determines that Haddad is connected to terrorist activity or organizations, a decision made openly concerning his deportation may assure the public that justice has been done.

### 3. Limitations on the Right of Access in Deportation Proceedings

■ The press' and public's right of access to deportation proceedings, as with other types of hearings, is not absolute. *See Globe Newspaper Co.,* 457 U.S. at 606, 102 S.Ct. 2613 (citations omitted). As one court has explained:

> The Constitution is not . . . a Freedom of Information Act. *See Houchins v. KQED,* 438 U.S. 1, 14, 98 S.Ct. 2588, 57 L.Ed.2d 553 (1978). There are limits to the right of access. It is doubtful that the right of access would extend to informal interviews or internal agency de-

liberations. A right of access is not a license to force disclosure of confidential information or to invade the decision-making processes of government officials ...

*Soc'y of Prof'l Journalists*, 616 F.Supp. at 577. To determine the limitations of the right of access and thus where the First Amendment will not prohibit a particular governmental action, courts traditionally apply a strict scrutiny analysis. *See, e.g., Globe Newspaper Co.*, 457 U.S. at 607, 102 S.Ct. 2613 (citations omitted); *Pechter*, 441 F.Supp. at 119–20 (stating that "[w]hen excluding members of the public ... it is well established that a judge may take only the most limited action necessary to sufficiently protect the interest perceived to be paramount to the interest of the public in an open hearing"). The Supreme Court described this analysis as follows:

> The presumption [of access] may be overcome only by an overriding interest based on findings that closure is essential to preserve higher values and is narrowly tailored to serve that interest. The interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered.

*Press–Enterprise II*, 478 U.S. at 9–10, 106 S.Ct. 2735. The Government contends, however, that the "facially legitimate and bona fide" standard the Supreme Court applied in *Kleindienst v. Mandel*, 408 U.S. 753, 769, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), is the proper test to follow when the government infringes upon constitutional rights in immigration cases, not the strict scrutiny standard applied when the infringement arises in criminal or civil proceedings in Article III courts.[8]

*Mandel* involved United States citizens' First Amendment challenge to the Attorney General's refusal to grant a waiver of excludability to a Marxist scholar, who sought to enter the United States temporarily to participate in several academic conferences. *Mandel*, 408 U.S. at 759–60, 92 S.Ct. 2576. The Supreme Court recognized that the plaintiffs had a First Amendment interest in hearing the alien explain and defend his views; the Court held, however, that the plaintiffs' interest was not dispositive of the issue in light of Congress' "plenary power to make rules for the admissions of aliens and to exclude those who possess those characteristics which Congress has forbidden." *Id.* at 765–66, 92 S.Ct. 2576 (citation omitted). The Court explained that "when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, nor test it by balancing its justification against

---

**8.** In the alternative, the Government argues that the Creppy directive only incidentally limits First Amendment freedoms; and thus, the Court only should require it to demonstrate an "important or substantial" interest and an infringement that "is no greater than is essential to the furtherance of that interest." *See* Government's 12(b)(6) Mot. as to Newspaper Plaintiffs at 24 (citing *U.S. v. O'Brien*, 391 U.S. 367, 376, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). The Government contends that the Creppy directive is not aimed at any First Amendment interest, but rather its purpose is to protect ongoing investigations into terrorism in the United States. However the Creppy directive directly infringes upon the Newspaper Plaintiffs' First Amendment rights and thus is quite unlike the incidental infringement at issue in *O'Brien* and its progeny. As the Sixth Circuit explained in *Brown & Williamson Tobacco Corp.*, 710 F.2d at 1179, there are two broad categories of exceptions to the practice of openness in the courtroom: those based on the need to keep order and dignity in the courtroom and those which center on the content of the information to be disclosed to the public. The first category may only need to pass the *O'Brien* test; however, as to the second category, "only the most compelling reasons" can justify closure. *Id.* at 1179–80.

the First Amendment interests of those who seek personal communication with the applicant." *Id.* at 770, 92 S.Ct. 2576.

 While the plenary power doctrine grants Congress significant latitude over *substantive* immigration decisions regarding who to admit to the country and the conditions under which they may remain, the power does not extend to the *procedures* Congress may employ to implement or enforce its substantive immigration decisions. As the Supreme Court stated in *Galvan v. Press*, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954), the plenary power doctrine applies to "[p]olicies pertaining to the entry of aliens and their right to remain here" but "[i]n the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process." *Galvan*, 347 U.S. at 531, 74 S.Ct. 737. Thus in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), the Supreme Court rejected the government's contention that the plenary power doctrine insulated the attorney general's decision to indefinitely detain excludable non-citizens with criminal convictions whose native countries were unwilling to accept their return. *Zadvydas*, 121 S.Ct. at 2501; *see also McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 493, 111 S.Ct. 888, 112 L.Ed.2d 1005 (1991)(holding that abuse-of-discretion standard, although appropriate to challenge judicial review of an administrative adjudication of the facts of an individual application, does not apply to constitutional or statutory claims). The Newspaper Plaintiffs do not challenge the Government's decision to remove Haddad, but merely its decision to close the removal proceedings. Thus, the standard of review applied in *Mandel* is inapplicable to the current procedural challenge.

a) **Whether the Government demonstrates that the Creppy directive serves a compelling interest and that it is narrowly tailored to achieve that interest**

 The Government provides the affidavit of James S. Reynolds, Chief of the Terrorism and Violent Crimes Section of the Justice Department's Criminal Division, to explain the interests served by the Creppy directive. *See* Govt's 12(b)(6) mot. as to Newspaper Plaintiffs at 18–22. In summary, the Government relies upon the following:

1. "[D]isclosing the names of 'special interest' detainees ... could lead to public identification of individuals associated with them, other investigative sources, and potential witnesses ... [and t]errorist organizations ... could subject them to intimidation or harm ..."

2. "[D]ivulging the detainees' identities may deter them from cooperating ... terrorist organizations with whom they have connection may refuse to deal further with them ..." thereby eliminating valuable sources of information for the Government and impairing its ability to infiltrate terrorist organizations.

3. "[R]eleasing the names of the detainees ... would reveal the direction and progress of the investigation ..." and "[o]fficial verification that a member [of a terrorist organization] has been detained and therefore can no longer carry out the plans of his terrorist organization may enable the organization to find a substitute who can achieve its goals ..."

4. "[P]ublic release of names, and place and date of arrest ... could allow terrorist organizations and others to interfere with the pending proceed-

ings by creating false or misleading evidence."

5. "[T]he closure directive is justified by the need to avoid stigmatizing 'special interest' detainees, who may ultimately be found to have no connection to terrorism . . ."

*See id.* The Government provides no basis for the closure of Haddad's proceedings other than those offered in Mr. Reynolds' affidavit, although the Court specifically invited the Government to articulate any other reasons it relied upon in that regard.[9]

Each of the interests the Government relies upon addresses the dangers associated with disclosing the name of the detainee, as well as the date and place of the detainee's arrest. With respect to the present matter, however, that information was made public from the outset. *See, e.g.,* Detroit Free Press' Mot. Ex. B (12/18/01 articles from Detroit Free Press' website regarding the INS' arrest and detention of Haddad) & C (12/19/01 articles from Detroit Free Press' website regarding same). Furthermore, neither in the Creppy directive nor elsewhere does the Government prohibit detainees in special interest cases (or their counsel or families) from revealing that information to the press and public. Thus the interests the Government offers cannot support its closure of Haddad's case even under the most deferential standard of review.[10]

## B. Other Factors for Determining Whether the Court Should Issue an Injunction

 Having found that the Newspaper Plaintiffs possess a First Amendment right of access to removal proceedings, it is clear that they will suffer irreparable injury if they are denied access to the upcoming hearings in Haddad's case. As the Supreme Court has held, "even minimal infringement upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *See Newsom v. Norris,* 888 F.2d 371, 378 (6th Cir.1989)(citing *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976))(plurality); *see also, N.Y. Times v. United States,* 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)(Black, J., concurring). This injury cannot be corrected at some later time, as the Government suggests, by reviewing any transcripts of the hearings that the Government may decide to make available or any appeal to the BIA Haddad may file. At that time, the information contained in Haddad's appeal or in the transcripts will be stale and there is no assurance that they will completely detail the proceedings. *See Soc'y of Prof'l Journalists,* 616 F.Supp. at 577–78 (finding that transcripts of hearings cannot substitute for openness and enjoining administrative agency from holding closed hearings). Furthermore, as the district court explained in *Society of Professional Journalists,* "[m]uch of what makes good news is

---

**9.** At oral argument, the Court specifically asked the Government whether it was relying solely on Mr. Reynolds' affidavit or whether the Creppy directive furthered other interests that were not identified in his affidavit. The Government indicated that the affidavit set forth all of the interests the directive served in Haddad's case.

**10.** The Court acknowledges that there may be cases in which the Government can demonstrate interests sufficient to justify closure (provided closure is the most narrowly tailored means for protecting the interests asserted). In fact, the immigration regulations specifically provide that despite a presumption of openness, the Immigration Judge may find that certain interests require a closed hearing. *See* 8 C.F.R. §§ 3.27 & 240.10.

lost in the difference between a one-dimensional transcript and an opportunity to see and hear testimony as it unfolds." *Id.* And finally, an appeal to the BIA may never occur if a removal order is not ordered or, if removed, Haddad decides to voluntarily depart.

Also weighing in the Newspaper Plaintiffs' favor is the Government's failure to identify how issuance of the requested injunction would cause substantial harm to others. Given the Court's previous analysis of the interests asserted by the Government to justify closure of Haddad's proceedings, the Court concludes that the injunction would not impose any hardship on the Government or others. And finally, as that analysis also demonstrated, the public's interest in fact would be served by issuance of the injunction.

Accordingly, being fully advised in the premises, having read the pleadings, and for the reasons set forth above, the Court hereby orders as follows:

The Newspaper Plaintiffs' motion for preliminary injunction [2–1] is **GRANTED**;

The Government's motion to dismiss complaint for failure to state a claim upon which relief can be granted [10–1] is **DENIED.**