*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0291P (6th Cir.)
File Name: 02a0291p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DETROIT FREE PRESS, et al.,
  *Plaintiffs-Appellees,*

  *v.*
          No. 02-1437

JOHN ASHCROFT, et al.,
  *Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
Nos. 02-70339; 02-70340; 02-70605—
Nancy G. Edmunds, District Judge.

Argued: August 6, 2002

Decided and Filed: August 26, 2002

Before: KEITH and DAUGHTREY, Circuit Judges;
CARR, District Judge.[*]

---

[*]The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:**    Gregory G. Katsas, UNITED STATES
DEPARTMENT OF JUSTICE, CIVIL DIVISION,
Washington, D.C., for Appellants.    Herschel P. Fink,
HONIGMAN MILLER SCHWARTZ & COHN LLP, Detroit,
Michigan, Lee Gelernt, AMERICAN CIVIL LIBERTIES
UNION FOUNDATION, New York, New York, for
Appellees. **ON BRIEF:**  Gregory G. Katsas, Eric D. Miller,
Sharon Swingle, Robert M. Loeb, UNITED STATES
DEPARTMENT OF JUSTICE, CIVIL DIVISION,
Washington, D.C., for Appellants. Herschel P. Fink, Brian D.
Wassom, HONIGMAN MILLER SCHWARTZ & COHN
LLP, Detroit, Michigan, Lee Gelernt, AMERICAN CIVIL
LIBERTIES UNION FOUNDATION, New York, New York,
Jonathan Rowe, SOBLE & ROWE, Ann Arbor, Michigan,
Leonard M. Niehoff, BUTZEL LONG, Ann Arbor, Michigan,
Michael J. Steinberg, Kary L. Moss, AMERICAN CIVIL
LIBERTIES UNION FUND OF MICHIGAN, Detroit,
Michigan, for Appellees.

_____

**OPINION**

_____

   DAMON J. KEITH, Circuit Judge.  The primary issue on
appeal in this case, is whether the First Amendment to the
United States Constitution confers a public right of access to
deportation hearings.  If it does, then the Government must
make a showing to overcome that right.

   No one will ever forget the egregious, deplorable, and
despicable terrorist attacks of September 11, 2001.  These
were cowardly acts. In response, our government launched an
extensive investigation into the attacks, future threats,
conspiracies, and attempts to come.  As part of this effort,

Amendment rights are not impermissibly compromised. Open proceedings, with a vigorous and scrutinizing press, serve to ensure the durability of our democracy.

## IV. Conclusion

For the foregoing reasons, we AFFIRM.

immigration laws are prosecuted with increased vigor. The issue before us today involves these efforts.

The political branches of our government enjoy near-unrestrained ability to control our borders. "[T]hese are policy questions entrusted exclusively to the political branches of our government." *Fiallo v. Bell*, 430 U.S. 787, 798 (1977). Since the end of the 19th Century, our government has enacted immigration laws banishing, or deporting, non-citizens because of their race and their beliefs. *See, e.g., Wong Wing v. United States*, 163 U.S. 228, 237 (1896) (court cannot limit Congress from expelling "aliens whose race or habits render them undesirable as citizens"); *Chae Chan Ping v. United States*, 130 U.S. 581 (1889) ("*The Chinese Exclusion Case*"); *Galvan v. Press*, 347 U.S. 522, 529 (1954) (finding that Congress can deport former member of Communist organization even if they personally did not advocate the violent overthrow of the Government); *Harisiades v. Shaughnessy,* 342 U.S. 580 (1952). While the Bill of Rights jealously protects citizens from such laws, it has never protected non-citizens facing deportation in the same way. In our democracy, based on checks and balances, neither the Bill of Rights nor the judiciary can second-guess government's choices. The only safeguard on this extraordinary governmental power is the public, deputizing the press as the guardians of their liberty.[1] "An informed public is the most potent of all restraints upon misgovernment[.]" *Grosjean v. Am. Press Co.,* 297 U.S. 233, 250 (1936). "[They] alone can here protect the values of democratic government." *New York Times v. United States,* 403 U.S. 713, 728 (1971) (per curiam) (Stewart, J., concurring).

Today, the Executive Branch seeks to take this safeguard away from the public by placing its actions beyond public

---

[1]A draft of the First Amendment specifically referred to the press as "one of the great bulwarks of liberty." *New York Times v. United States*, 403 U.S. 713, 716 (1971) (per curiam) (Black, J., concurring).

scrutiny. Against non-citizens, it seeks the power to secretly deport a class if it unilaterally calls them "special interest" cases. The Executive Branch seeks to uproot people's lives, outside the public eye, and behind a closed door. Democracies die behind closed doors. The First Amendment, through a free press, protects the people's right to know that their government acts fairly, lawfully, and accurately in deportation proceedings. When government begins closing doors, it selectively controls information rightfully belonging to the people. Selective information is misinformation. The Framers of the First Amendment "did not trust any government to separate the true from the false for us." *Kleindienst v. Mandel*, 408 U.S. 753, 773 (1972) (quoting *Thomas v. Collins*, 323 U.S. 516, 545 (Jackson, J., concurring)). They protected the people against secret government.

The Office of the Chief Immigration Judge, under the authorization of Attorney General John Ashcroft, designates certain cases to be special interest cases, conducted in secret, closed off from the public. Arguing that closure of these hearings was unconstitutional, plaintiffs in three separate cases sought an injunction against such action. The Government filed a motion to dismiss, arguing that closing special interest cases was not unconstitutional.

The district court granted the injunction, finding blanket closure of deportation hearings in "special interest" cases unconstitutional. For the reasons that follow, we **AFFIRM** the district court's order granting Plaintiffs a preliminary injunction.

## I. Facts and Procedural History

On September 21, 2001, Chief Immigration Judge Michael Creppy issued a directive (the "Creppy directive") to all United States Immigration Judges requiring closure of special interest cases. The Creppy directive requires that all proceedings in such cases be closed to the press and public,

Court has held that even a minimal infringement upon First Amendment rights constitutes irreparable injury sufficient to justify injunctive relief. *See Newsom v. Norris*, 888 F.2d 371, 378 (6th Cir. 1989) (citing *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality). As the district court noted, no subsequent measures can cure this loss, because the information contained in the appeal or transcripts will be stale, and there is no assurance that they will completely detail the proceedings. *Detroit Free Press*, 195 F. Supp. 2d at 947 (citing *Soc'y of Prof'l Journalists*, 616 F. Supp. at 577-78 (finding that transcripts of hearings cannot substitute for openness and enjoining administrative agency from holding closed hearings)). Additionally,

much of what makes good news is lost in the difference between a one-dimensional transcript and an opportunity to see and hear testimony as it unfolds." . . . And finally, an appeal to the BIA may never occur if a removal order is not ordered or, if removed, Haddad decides to voluntarily depart

Id. at 947-48 (quoting *Soc'y of Prof'l Journalists*, 616 F. Supp. at 577-578). Moreover, the injunction will not cause substantial harm to others because the Government can seek closure in individual cases at appropriate times.

Lastly, the public's interests are best served by open proceedings. A true democracy is one that operates on faith – faith that government officials are forthcoming and honest, and faith that informed citizens will arrive at logical conclusions. This is a vital reciprocity that America should not discard in these troubling times. Without question, the events of September 11, 2001, left an indelible mark on our nation, but we as a people are united in the wake of the destruction to demonstrate to the world that we are a country deeply committed to preserving the rights and freedoms guaranteed by our democracy. Today, we reflect our commitment to those democratic values by ensuring that our government is held accountable to the people and that First

relationship to the ongoing anti-terrorism investigation." *See* Gov't Reply at 23. Assuming such an evaluation has occurred, we find that problems still remain. The task of designating a case special interest is performed in secret, without any established standards or procedures, and the process is, thus, not subject to any sort of review, either by another administrative entity or the courts. Therefore, no real safeguard on this exercise of authority exists. "Civil liberties, as guaranteed by the Constitution, imply the existence of an organized society maintaining public order without which liberty itself would be lost in the excesses of unrestrained abuses." *United States v. United States District Court*, 407 U.S. 297, 312 (1972) (quoting *Cox v. New Hampshire*, 312 U.S. 569, 574 (1941). The Government states that special interest cases represent "a small, carefully chosen subset of the universe of aliens facing removal proceedings." Yet, to date, the Government has failed to disclose the actual number of special interest cases it has designated.

In sum, we find that the Government's attempt to establish a narrowly tailored restriction has failed. The Creppy directive is under-inclusive by permitting the disclosure of sensitive information while at the same time drastically restricting First Amendment rights. The directive is over-inclusive by categorically and completely closing all special interest hearings without demonstrating, beyond speculation, that such a closure is absolutely necessary.

B.    Other Factors for Determining Whether to Grant a
       Preliminary Injunction

"When a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Nonetheless, the other three factors also favor granting an injunction. The Newspaper Plaintiffs will undoubtedly suffer irreparable injury if they are denied access to Haddad's upcoming hearings. The Supreme

including family members and friends. The Record of the Proceeding is not to be disclosed to anyone except a deportee's attorney or representative, "assuming the file does not contain classified information." "This restriction on information includes confirming or denying whether such a case is on the docket or scheduled for a hearing."

On December 19, 2002, Immigration Judge Elizabeth Hacker conducted a bond hearing for Rabih Haddad ("Haddad"), one such special interest case. Haddad was subject to deportation,[2] having overstayed his tourist visa. The Government further suspects that the Islamic charity Haddad operates supplies funds to terrorist organizations. Haddad's family, members of the public, including Congressman John Conyers, and several newspapers sought to attend his deportation hearing. Without prior notice to the public, Haddad, or his attorney, courtroom security officers announced that the hearing was closed to the public and the press. Haddad was denied bail, detained, and has since been in the government's custody. Subsequent hearings, conducted on January 2 and 10, 2002, were also closed to the public and the press. Haddad has been transferred to Chicago for additional proceedings.

Haddad, several newspapers (the "Newspaper Plaintiffs"),[3] and Congressman Conyers filed complaints for injunctive and declaratory relief, asserting claims under (1) the Administrative Procedures Act ("APA"), 5 U.S.C. § 551 *et*

---

[2] With the passage of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Congress changed the nomenclature of exclusion and deportation proceedings. Both are now referred to as "removal" hearings. *See* 8 U.S.C. § 1229a. However, the historical and legal distinctions still remain. *See Zadvydas v. Davis,* 533 U.S. 678, 693 (2001).

[3] The Detroit Free Press, Inc. and Herald Co., Inc., the Detroit News, Inc., and Metro Times, Inc. On March 5, 2002, the three suits were consolidated for pretrial matters.

*seq.*; (2) the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.,* and the regulations promulgated thereunder, 8 C.F.R. §§ 3.27 & 240.10; and (3) the First and Fifth Amendments to the United States Constitution. They named Attorney General Ashcroft, Chief Immigration Judge Creppy, and Immigration Judge Hacker as defendants (collectively "the Government"). Among the claims asserted, the Newspapers Plaintiffs (separately from Haddad) sought a declaratory judgment that the Creppy directive, facially and as applied, violated their First Amendment right of access to Haddad's deportation proceedings. They further sought to enjoin subsequent closures of proceedings in Haddad's case and a release of all transcripts and documents from previous proceedings.[4]

The district court granted the Newspaper Plaintiffs' motion. Finding that the Newspaper Plaintiffs had a First Amendment right of access to the proceedings under *Richmond Newspapers Inc., v. Virginia,* 448 U.S. 555 (1980), and its progeny,[5] the district court further declined to review the Government's actions under the highly deferential standard articulated in *Kleindienst v. Mandel*, 408 U.S. 753 (1972). *See Detroit Free Press v. Ashcroft,* 195 F. Supp. 2d 937, 946 (E.D. Mich. 2002). The Government timely filed its notice of appeal. In the interim, on April 10, 2002, the Government obtained a temporary stay of the district court's order from this Court. On April 18, 2002, we dissolved the temporary stay and denied the Government's motion for stay pending this appeal.

---

[4]The district court did not reach the merits of the other claims. We too express no opinion as to the merits of these other claims.

[5]Subsequent to its decision in *Richmond Newspapers*, the Court decided three more cases further refining the formulation set forth in *Richmond Newspapers. See Globe Newspaper Co. v. Superior Court,* 457 U.S. 596 (1982)*; Press-Enterprise Co. v. Superior Court,* 464 U.S. 501 (1984) (*Press-Enterprise I*); *Press-Enterprise Co. v. Superior Court,* 478 U.S. 1 (1986) (*Press-Enterprise II*).

*Associate Attorney General Jay Stephens Regarding the Sixth Circuit Decision in the Haddad Case*, (last modified 8/20/02) <http://www.usdoj.gov/opa/*pr/2002/April/02_ag_238.htm*>. Yet, all these hearings were closed. The only reason offered for closing the hearings has been that the presiding immigration judge was told do it by the chief immigration judge who in turn was told to do it by the Attorney General.

Furthermore, there seems to be no limit to the Government's argument. The Government could use its "mosaic intelligence" argument as a justification to close any public hearing completely and categorically, including criminal proceedings. The Government could operate in virtual secrecy in all matters dealing, even remotely, with "national security," resulting in a wholesale suspension of First Amendment rights. By the simple assertion of "national security," the Government seeks a process where it may, without review, designate certain classes of cases as "special interest cases" and, behind closed doors, adjudicate the merits of these cases to deprive non-citizens of their fundamental liberty interests.

This, we simply may not countenance. A government operating in the shadow of secrecy stands in complete opposition to the society envisioned by the Framers of our Constitution. "[F]ully aware of both the need to defend a new nation and the abuses of the English and Colonia governments, [the Framers of the First Amendment] sought to give this new society strength and security by providing that freedom of speech, press, religion, and assembly should not be abridged." *See New York Times*, 403 U.S. at 719 (Black, J., concurring).

Moreover, we find unpersuasive the Government's argument that the closure of special interest hearings has been accomplished on a case-by-case basis. In its reply, the Government alleges that "[e]ach special interest detainee has been evaluated and designated on the basis of the government's ongoing investigative interest in him and his

to sustain its burden of proof in a case involving the overstay of legally admitted non-citizens, the government need only establish that the non-citizen was admitted for particular and set time period, that period has elapsed, and that the non-citizen has failed to depart.").

Here, the Government has detained Haddad and instituted removal proceedings based on his overstay of a tourist visa. Thus, the Government need only establish that Haddad obtained a visa, the visa has expired, and that he is still in the country. Very little information is required. The fact that the Government may have to contest the non-citizen's application for discretionary relief is similarly unavailing. At oral argument, it was brought to our attention that Haddad intends to apply for asylum, a form of discretionary relief available to non-citizens in deportations proceedings. We see no reason why, in making its case against the applicant's request for discretionary relief, the Government could not seek to keep confidential, pertinent information, as the need arises.

Finally, the Government seeks to protect from disclosure the bits and pieces of information that seem innocuous in isolation, but when pieced together with other bits and pieces aid in creating a bigger picture of the Government's anti-terrorism investigation, i.e., the "mosaic intelligence." Mindful of the Government's concerns, we must nevertheless conclude that the Creppy directive is over-inclusive. While the risk of "mosaic intelligence" may exist, we do not believe speculation should form the basis for such a drastic restriction of the public's First Amendment rights. *See Press-Enter. II*, 478 U.S. at 13 ("Since a qualified First Amendment right of access attaches . . . , the proceeding cannot be closed unless *specific, on the record findings are made* demonstrating that closure is *essential to preserve higher values* and is narrowly tailored to serve that interest."). Fittingly, in this case, the Government subsequently admitted that there was no information disclosed in any of Haddad's first three hearings that threatened "national security or the safety of the American people." U.S. Dept. of Justice, *Statement of*

## II.  Standard of Review

We review the grant of a preliminary injunction for an abuse of discretion, but questions of law are reviewed de novo. *Gonzalez v. National Board of Medical Examiners,* 225 F.3d 620, 625 (6th Cir. 2000).

To determine whether to grant a motion for a preliminary injunction, a court must analyze the following four factors:

"(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction."

*Bonnell,* 241 F.3d at 809 (quoting *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998)).

## III.  Analysis

### A.   Likelihood of Success on the Merits

#### 1.   THE EFFECT OF THE GOVERNMENT'S PLENARY POWER OVER IMMIGRATION

The Government argues that the district court erred in ruling that the government's plenary power over immigration did not warrant deferential review. *See, e.g., Kleindienst v. Mandel*, 408 U.S. 753 (1972) (no First Amendment bar to excluding people because of their beliefs); *Wong Wing*, 163 U.S. at 237 (court cannot limit Congress from expelling "aliens whose race or habits render them undesirable as citizens"). We are unpersuaded by the Government's claim, which would require complete deference in all facets of immigration law, including non-substantive immigration laws that infringe upon the Constitution. We hold that the Constitution meaningfully limits non-substantive immigration

laws and does not require special deference to the Government.

The Government's broad authority over immigration was first announced more than one-hundred years ago in *The Chinese Exclusion Case*, 130 U.S. 581 (1889). In that case, the Court recounted the strife following Chinese immigration to California after the gold rush of the mid-1800's. A convention of lawmakers in California had petitioned Congress to alleviate this "problem." The petition charged, among other things, that:

the presence of Chinese laborers had a baneful effect upon the material interests of the State, and upon public morals; that their immigration was in numbers approaching the character of an Oriental invasion, and was a menace to our civilization . . . .

*Id.* at 595. Noting this plea against "existing and anticipated evils," the Court valued the "the well-founded apprehension – from the experience of years – that limitation to the immigration of certain classes from China was essential to the peace of the community on the Pacific Coast, and possibly the preservation of our civilization there." *Id.* at 594. Adding that "[i]t seemed impossible for them to assimilate with our people or to make any change in their habits or modes of living[,]" *id.* at 595, the Court found that "if the government . . . considers the presence of foreigners of a different race in this country, who will not assimilate with us, to be dangerous to its peace and security," this "determination is conclusive upon the judiciary." *Id.* at 606; *see also Fiallo*, 430 U.S. at 792 ("The power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.") (citations omitted). This power was derived not from an express provision of the Constitution, but from powers incident to sovereignty. *The Chinese Exclusion Case,* 130 U.S. at 609.

public on a case-by-case basis through protective orders or in camera review – for    example, the identification of investigative sources and witnesses. The Government, however, argues that it is impossible to keep some sensitive information confidential if any portion of a hearing is open or if the immigration court conducts a hearing to determine if closure is proper. Stated differently, the Government argues that there is sensitive information that would be disclosed if closure occurred on a case-by-case basis. First, the Government contends that the identities of the detainees would be revealed if closure occurred on a case-by-case basis, and such information would impede the anti-terrorism investigation. This information, however, is already being disclosed to the public through the detainees themselves or their counsel. Even if, as a result of the interim rule, a detainee remains silent, a terrorist group capable of sophisticated intelligence-gathering would certainly be made aware that one of its operatives, or someone connected to a particular terrorist plot, has disappeared into the Government's custody. Moreover, if a deportee does have links to terrorist organizations, there is nothing to stop that deportee from divulging the information learned from these proceedings once deported.

Next, the Government argues that open hearings would reveal the amount of intelligence that the Government does not possess. The Government argues that evidence concerning a particular detainee could be incomplete, and an incomplete presentation of evidence would permit terrorists groups to gauge how much the Government knows and does not know about their operations. The issue in a removal hearing is, however, narrowly focused and the Government has enormous control over what evidence it introduces. "To deport an overstay, the INS must convince the immigration judge by clear and convincing evidence that the alien was admitted as a non-immigrant for a specific period, that the period has elapsed, and that the alien is still in this country." *Shahla v. INS,* 749 F.2d 561, 563 (9th Cir. 1984), *see also Chou v. INS*, 774 F.2d 1318, 1319 (5th Cir. 1985) ("[I]n order

under this section shall remain in effect *until vacated by the Immigration Judge.*"  *See* 67 Fed. Reg. 36799; 8 C.F.R. § 3.46(f)(3) (emphasis added).  It also provides that "[a]ny information submitted subject to the protective order . . . shall remain under seal as part of the administrative record."  These prohibitions are impermissible to the extent that they indefinitely restrain a deportee's ability to divulge all information, including information obtained independently from the deportation proceedings.  *See, e.g., Butterworth v. Smith,* 494 U.S. 624, 632 (1990) (holding that statute prohibiting witness from forever disclosing testimony before grand jury violates the First Amendment insofar as it prohibits witness from disclosing his own testimony after grand jury's term ends); *see also Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 31-32 (1984); *Rogers v. United States Steel Corp.,* 536 F.2d 1001, 1006 (3d Cir. 1976).  The Government argues that its interests include concerns about dangers associated with disclosing the deportees' names, as well as the dates and places of arrest.  Such information is known independently from the proceedings.  Therefore, such information cannot properly be protected.  To avoid this constitutional problem, we construe the orders to terminate when the deportation proceedings end.  At this juncture, nothing precludes the deportee from disclosing this information.  Thus, the interim rule does not remedy the under-inclusiveness of the Creppy directive.

The interim rule notwithstanding, the Creppy directive is also over-inclusive, being too broad and indiscriminate.  The Government contends that the closure mandated by the Creppy directive is narrowly tailored because "no less restrictive alternative would serve the Government's purpose."  *See United States v. Playboy,* 529 U.S. 803, 815 (2000) ("[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it.").

It is clear that certain types of information that the Government seeks to keep confidential could be kept from the

Today, the Government seeks to expand upon the rule from this case.  The Government argues that it has plenary authority over not only substantive immigration laws and decisions, but also non-substantive ones, like the Creppy directive.[6]  Therefore, whether or not there is a First Amendment right of access to deportation proceedings, the Government argues, it can implement any non-substantive policy infringing upon that right if it is "facially legitimate and bona fide."[7]  *See Kleindienst,* 408 U.S. at 770.

Even *The Chinese Exclusion Case,* however, acknowledged that Congress's power over immigration matters was limited by "the constitution itself."  *Id.* at 604.  Were we to adopt the Government's position, one would wonder whether and how the Constitution could limit the political branches' power over immigration matters.  Similarly, that position would undercut the force of the First Amendment.  "The dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information."  *New York Times,* 403 U.S. at 723-24 (Douglas, J., concurring) (citations omitted).  It would be ironic, indeed, to allow the Government's assertion of plenary power to transform the First Amendment from the great instrument of open democracy to a safe harbor from public scrutiny.  In the words of Justice Murphy, "[such a] conclusion would make our constitutional safeguards transitory and discriminatory in

---

[6]The difference between a substantive and non-substantive immigration law is that substantive immigration laws answer the questions, "who is allowed entry" or "who can be deported."

[7]The Government makes two related arguments that are dealt with simultaneously in this section.  First, the Government argues that their plenary power supercedes any First Amendment right of access.  Second, the Government argues that even if the First Amendment does operate in deportation hearings, it does not follow that we should apply the normal strict scrutiny test.  Instead, the Government argues that their plenary power over immigration matters entitles them to more deference.  Under either scenario, the Government argues that their procedures in this case should be upheld if "facially legitimate and bona fide."

nature . . . . [We] cannot agree that the framers of the Constitution meant to make such an empty mockery of human freedom." *Bridges v. Wixon,* 326 U.S. 135, 162 (1945) (Murphy, J., concurring). As a result, the Government's stated position finds no authority in the Constitution and is untenable.

a. *The Government's Interprets* Kleindienst *Too Broadly*

The Government's blanket reliance on *Kleindienst* ignores the varied aspects of immigration law. Immigration includes substantive laws over who may enter or remain in this country, laws governing procedural aspects of immigration hearings, and regulations on the mechanics of deportation. Although acknowledging the political branches' plenary power over all substantive immigration laws and non-substantive immigration laws that do not implicate constitutional rights, the Supreme Court has repeatedly allowed for meaningful judicial review of non-substantive immigration laws where constitutional rights are involved. *Kleindienst* did not change these long-standing traditions.

In *Kleindienst*, Ernest Mandel, a self-proclaimed "revolutionary Marxist" and Belgian citizen, sought entry into the United States to speak at a conference at Stanford University. *Kleindienst*, 408 U.S. at 756-59. Mandel applied for and was denied a non-immigrant visa under a blanket provision of the Immigration and Nationality Act, §212(a)(28), prohibiting the entrance of "anarchists" or "persons advocating the overthrow of the government." *Id.* at 759. In excluding Mandel, the Attorney General declined to exercise his discretionary authority to waive this prohibition. *Id.*

Several professors brought suit alleging a violation of their First Amendment rights. The Court stated the issue as this: "Whether the First Amendment confers upon the appellee professors, because they wish to hear, speak, and debate with

persuasive argument as to why the Government's concerns cannot be addressed on a case-by-case basis. The Newspapers Plaintiffs argue, and the district court agreed, that the Creppy directive is ineffective in achieving its purported goals because the detainees and their lawyers are allowed to publicize the proceedings. According to the Newspaper Plaintiffs, to the extent that Haddad had discussed his proceedings (and disclosed documents) with family, friends and the media, the information that the Government seeks to protect is disclosed to the public anyway. We are not persuaded by the Government's argument in response that few detainees will disclose any information and that their disclosure will be less than complete public access. This contention is, at best, speculative and belies the Government's assertion that *any* information disclosed, even bits and pieces that seem innocuous, will be detrimental to the anti-terrorism investigation.

The recent interim rule promulgated by the Department of Justice ("DOJ") regarding protective orders and sealing of documents in these special interest cases does not fully address our concern that the Creppy directive is under-inclusive.[17] The parties do not dispute that the rule is meant to work in tandem with the Creppy directive. The interim DOJ rule authorizes immigration judges to issue protective orders and seal documents relating to law enforcement or national security information in the course of immigration proceedings. *See* 67 Fed. Reg. 36799. Pursuant to the interim rules, the immigration judge is authorized to order that detainees and their attorneys refrain from disclosing certain confidential information.

By their express terms, the interim rules restrain deportees from communicating information for an indefinite period of time. The interim rules provide that "protective orders issued

---

[17]The Government informed us of the interim rule pursuant to a Rule 28j letter dated June 12, 2002 and both parties made reference to the rule during oral arguments.

the government discloses the evidence it has about a particular member of a terrorist organization, but fails to mention that the detainee is involved in an impending attack, the other members of the organization may be able to infer that the government is not yet aware of the attack."

*See* Gov't Brief at 47-49.

Inasmuch as these agents' declarations establish that certain information revealed during removal proceedings could impede the ongoing anti-terrorism investigation, we defer to their judgment. These agents are certainly in a better position to understand the contours of the investigation and the intelligence capabilities of terrorist organizations. *Cf. CIA v. Sims*, 471 U.S. 159, 180 (1985) (stating that "it is the responsibility of the Director of Central Intelligence, not that of the judiciary, to weigh the variety of complex and subtle factors in determining whether the disclosure of information may lead to unacceptable risk of compromising the Agency's intelligence-gathering process.").

    b.   *The Creppy Directive Does Not Require Particularized Findings*

Although the Government is able to demonstrate a compelling interest for closure, the immigration judge, Defendant Hacker, failed to make specific findings before closing Haddad's deportation proceedings. *Press-Enterprise II* instructs that in cases where partial or complete closure is warranted, there must be specific findings on the record so that a reviewing court can determine whether closure was proper and whether less restrictive alternatives exist. *Press-Enter. II*, 478 U.S. at 13. Similarly, the Creppy directive fails this requirement.

    c.   *The Creppy Directive is Not Narrowly Tailored*

Finally, the blanket closure rule mandated by the Creppy directive is not narrowly tailored. The Government offers no

Mandel in person, the ability to determine that Mandel should be permitted to enter the country or, in other words, to compel the Attorney General to allow Mandel's admission." *Id.* at 762. The Court, while acknowledging that the professors' First Amendment rights were implicated, affirmed the decision denying Mandel a visa. The Court stated:

> plenary congressional power to make policies and rules for exclusion of aliens has long been firmly established. In the case of an alien excludable under § 212(a)(28), Congress has delegated conditional exercise of this power to the Executive. We hold that when the Executive exercises this power negatively on the basis of a facially legitimate and bona fide reason, the courts will neither look behind the exercise of that discretion, *nor test it by balancing its justification against the First Amendment interests* of those who seek personal communication with the applicant.

*Id.* at 769-70 (emphasis added).

*Kleindienst* differs from the present case in two important, and related, ways. First, *Kleindienst* involved a substantive immigration decision. The law and decision at issue determined who entered the United States. Here, the Creppy directive has no effect on the eventual outcome of the deportation hearings. Second, *Kleindienst*, although recognizing a constitutional right, did not give any weight to that right. It specifically declined to balance the First Amendment right against the government's plenary power, because the law was a substantive immigration law. Therefore, if the First Amendment limits non-substantive immigration laws, *Kleindienst* offers no authority that the Government's actions are entitled to deferential review -- *Kleindienst* ignored the existence of the professors' First Amendment rights altogether. Nor does it offer authority that the First Amendment does not limit non-substantive immigration laws -- *Kleindienst* involved a substantive immigration law. In a case such as this, where a non-

substantive immigration law involving a constitutional right is at issue, the Supreme Court has always recognized the importance of that constitutional right, never deferring to an assertion of plenary authority.

  b.  *The Constitution, Including the First Amendment, Meaningfully Limit Non-Substantive Immigration Laws*

The Supreme Court has always interpreted the Constitution meaningfully to imit non-substantive immigration laws, without granting the Government special deference. First, the Supreme Court has explicitly stated that non-citizens are afforded "the same constitutional protections of due process that we accord citizens" *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 309 (1970) (citing *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953) (stating that "once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders.")).

As old as the first immigration laws of this country is the recognition that non-citizens, even if illegally present in the United States, are "persons" entitled to the Fifth Amendment right of due process in deportation proceedings. *See Wong Wing,* 163 U.S. at 238 (recognizing Fifth Amendment right in deportation proceedings); *see also Shaughnessy v. United States ex rel. Mezei,* 345 U.S. 206, 212 (1953) ("It is true that aliens who have once passed through our gates, even illegally, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law.") (citing *Yamataya v. Fisher,* 189 U.S. 86, 100-101 (1903) ("*The Japanese Immigrant Case*"); *Wong Yang Sung v. McGrath*, 339 U.S. 33, 49-50 (1950); *Kwong Hai Chew*, 344 U.S. at 598)). Therefore, the Fifth Amendment limits non-substantive immigration laws.

As firmly established as the due process rights of deportees is the rule that non-citizens seeking initial entry have no right

"Bits and pieces of information that may appear innocuous in isolation," but used by terrorist groups to help form a "bigger picture" of the Government's terrorism investigation, would be disclosed.     The Government describes this type of intelligence gathering as "akin to the construction of a mosaic," where an individual piece of information is not of obvious importance until pieced together with other pieces of information. *J. Roderick MacArthur Found. v. F.B.I.*, 120 F.3d 600, 604 (D.C. Cir. 1996); *see also CIA v. Sims*, 471 U.S. 159, 178 (1985) (recognizing the validity of this model of intelligence gathering); *Ingel v. D.O.J.,* 689 F.2d 259, 268 (6th Cir. 1983) (same); *Halperin v. CIA,* 629 F.2d 144, 150 (D.C. Cir. 1980 ("[E]ach individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information even when the individual piece is not of obvious importance in itself."); *United States v. Marchetti,* 466 F.2d 1309, 1318 (4th Cir. 1972) ("What may seem trivial to the uninformed, may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in its proper context.").

The identifications of the detainees, witnesses, and investigative sources would be disclosed.   Terrorist groups could subject these individuals or their families to intimidation or harm and discourage them from cooperating with the Government.

Methods of entry to the country, communicating, or funding could be revealed. This information could allow terrorist organizations to alter their patterns of activity to find the most effective means of evading detection.

"Information that is *not* presented at the hearings also might provide important clues to terrorist, because it could reveal what the investigation has not yet discovered." The Government provides this example: "If

longer carry out the plans of his terrorist organization may enable the organization to find a substitute who can achieve its goals . . . ."

4.  "[P]ublic release of names, and place and date of arrest . . . could allow terrorist organizations and others to interfere with the pending proceedings by creating false or misleading evidence."

5.  "[T]he closure directive is justified by the need to avoid stigmatizing 'special interest' detainees, who may ultimately be found to have no connection to terrorism . . . ."

*See Detroit Free Press*, 195 F. Supp. 2d at 946-47.

Although the district court specifically invited the Government to articulate any other basis for closing Haddad's deportation hearing, the Government provided the district court no other reasons for closure. *Id.* at 947 n.9.

The Government certainly has a compelling interest in preventing terrorism. In addition to Mr. Reynold's affidavit, other affidavits have been provided that justify the Government's interest in closure.[16] According to the additional affidavits, public access to removal proceedings would disclose the following information that would impede the Government's investigation:

---

[16]After the district court granted the Newspapers' motion for a preliminary injunction, the Government moved for reconsideration, or in the alternative, a stay of the injunction pending appeal. In support of its motion, the Government offered additional declarations. The district court concluded that the new affidavits presented by the Government did not alter its First Amendment conclusions, and noted that the Government had specifically informed the district court at oral argument that it was relying solely on the affidavits it had submitted up to that point, which did not include the additional declarations.

to due process. *See Ex rel. Mezei*, 345 U.S. at 212 ("[A]n alien on the threshold of initial entry stands on different footing[.]"). Non-citizens seeking initial entry have no ties to the United States, and are, therefore, not "persons" within the meaning of the Fifth Amendment. *See Kwong Hai Chew*, 344 U.S. at 598. Whatever process the government affords them, no matter how minimal, illusory, or secret, is due process of law, beyond the scope of judicial review. *See Ex rel. Mezei*, 345 U.S. at 212 (citing *Knauff v. Shaughnessy*, 338 U.S. 537, 544 (1950)).

Therefore, in stark contrast to a deportation hearing, the Government may exclude a non-citizen seeking initial entry without a hearing or disclosure of the evidence and reasons relied upon. *Compare Knauff*, 338 U.S. 537 *with Kwock Jan Fat v. White*, 253 U.S. 454 (1920). The difference between these two situations demonstrates not only that the Bill of Rights limits the government's power over non-substantive immigration laws, but also that the limitation is meaningful. The Government is not entitled to special deference in this area.

In *Knauff v. Shaughnessy*, the Attorney General excluded the alien-wife of a citizen and war veteran without a hearing or reasons for the decision. *Knauff*, 253 U.S. at 539. The Court stated: "Whatever the rule may be concerning deportation of persons who have gained entry into the United States, it is not within the province of any court . . . to review the determination of the political branch of the Government to exclude a given alien." *Id.* at 543 (citations omitted).

In *Kwock Jan Fat v. White*, the government tried to deport a person claiming citizenship, based on evidence produced *in absentia* and not recorded or released to the deportee. *Kwock Jan Fat*, 253 U.S. at 457. Not deferring to the government's interpretation of due process, or its reasons for limiting the process given, the Court reversed the order of deportation. *Id.* at 465. Fittingly, the Court warned of the danger of secret hearings, given the government's extraordinary power:

The acts of Congress give great power to the Secretary of Labor over Chinese immigrants and persons of Chinese descent. It is a power to be administered, not arbitrarily and secretly, but fairly and openly under the restraints of the tradition and principles of free government applicable where the fundamental rights of men are involved, regardless of their origin or race.

*Id.* at 464. Requiring this exacting, non-deferential review of the Fifth Amendment was important, because it was the "province of the courts, in proceedings for review, to prevent abuse of [the government's] extraordinary power." *Id*; *see also Wong Wing,* 163 U.S. 228 (finding that deportation procedures violated Fifth and Sixth Amendment); *Galvan v. Press*, 347 U.S. 522, 531 (1954) ("Policies pertaining to the entry of aliens and their right to remain here are peculiarly concerned with the political conduct of government. In the enforcement of these policies, the Executive Branch of the Government must respect the procedural safeguards of due process.") (citations omitted).

The difference between the Court's deferential review of non-substantive laws and procedures in *Knauff* and its exacting review in *Kwock Jan Fat* lies not in the fact that the former involved an exclusion proceeding and the latter a deportation proceeding; nor does it lie in the fact that *Kwock Jan Fat* was based on any added rights afforded citizens, as the Court discussed the power over both "Chinese immigrants and persons of Chinese descent." *Kwock Jan Fat*, 253 U.S. at 464. Rather, the difference in the Court's review turned on the existence of a constitutional right. As a non-citizen seeking initial entry, Knauff was not a "person" entitled to due process within the meaning of the Fifth Amendment, while Kwock Jan Fat was such a person, having been at least a resident. *See also Ex rel. Mezei*, 345 U.S. at 215 (excluding a non-citizen upon initial entry does not "deprive him of any statutory or constitutional right"). The premium placed on constitutional rights, not formalistic distinctions between exclusion and deportation proceedings, can further be shown

directive is neither narrowly tailored, nor does it require particularized findings. Therefore, it impermissibly infringes on the Newspaper Plaintiffs' First Amendment right of access.

    a.   *The Government Cites Compelling Interests*

We do not agree with the district court that the Government failed to demonstrate that there are compelling interests sufficient to justify closure. The Government contends that "[c]losure of removal proceedings in special interest cases is necessary to protect national security by safeguarding the Government's investigation of the September 11 terrorist attack and other terrorist conspiracies." *See* Gov't Brief at 46.

Before the district court, the Government provided the affidavit of James S. Reynolds, Chief of the Terrorism and Violent Crimes Section, to explain the types of information that public access to removal proceedings would disclose. In his affidavit, Mr. Reynolds explained the rationale for prohibiting public access to the proceedings as follows:

    1. "[D]isclosing the names of 'special interest' detainees . . . could lead to public identification of individuals associated with them, other investigative sources, and potential witnesses . . . [and t]errorist organizations . . . could subject them to intimidation or harm . . . ."

    2. "[D]ivulging the detainees' identities may deter them from cooperating . . . terrorist organizations with whom they have connection may refuse to deal further with them . . ." thereby eliminating valuable sources of information for the Government and impairing its ability to infiltrate terrorist organizations.

    3. "[R]eleasing the names of the detainees . . . would reveal the direction and progress of the investigation . . ." and "[o]fficial verification that a member [of a terrorist organization] has been detained and therefore can no

understanding." *See First Amendment Coalition*, 784 F.2d at 486 (Adams, J., concurring in part, dissenting in part).

Fifth, public access helps ensure that "the individual citizen can effectively participate in and contribute to our republican system of self-government." *Globe Newspaper*, 457 U.S. at 604. "[A] major purpose of [the First Amendment] was to protect the free discussion of governmental affairs." *Id.* Public access to deportation proceedings helps inform the public of the affairs of the government. Direct knowledge of how their government is operating enhances the public's ability to affirm or protest government's efforts. When government selectively chooses what information it allows the public to see, it can become a powerful tool for deception.

Additionally, the Government has not identified one persuasive reason why openness would play a negative role in the process. Nothing like the excessive financial burdens noted by the Supreme Court in *Houchins* would be applicable here.

Having found a First Amendment right of access to deportation hearings, we now determine whether the Government has made a sufficient showing to overcome that right.

### 4.   STRICT SCRUTINY

Under the standard articulated in *Globe Newspaper*, government action that curtails a First Amendment right of access "in order to inhibit the disclosure of sensitive information" must be supported by a showing "that denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co.*, 457 U.S. at 606-07. Moreover, "[t]he interest is to be articulated along with findings specific enough that a reviewing court can determine whether the closure order was properly entered." *Press-Enter. II*, 478 U.S. at 10. The Government's ongoing anti-terrorism investigation certainly implicates a compelling interest. However, the Creppy

by the fact that the Supreme Court has reversed exclusions of non-citizens where they had sufficient ties to the United States to give them standing to assert constitutional rights.

For example, in *Landon v. Plasencia,* 459 U.S. 21 (1982), the Court held that a resident non-citizen, returning from a brief trip abroad, was entitled to due process, including a hearing regarding the charges underlying the attempt to exclude him. *Id.* at 33. While noting the sovereign's broad power to admit or exclude non-citizens, the Court stated that "once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly." *Id.* at 32. Therefore, we are especially concerned with certain immigration procedures because constitutional rights are involved.

Additionally, in *Landon*, the Court implied that no uniquely deferential due process analysis applied in the immigration context. By applying law from a seminal non-immigration due process case, the Court suggested that it had determined the Fifth Amendment issue as it would have outside of the immigration context. *See id.* at 33 (citing *Matthews v. Eldridge*, 424 U.S. 319, 334-335 (1976)).

The Government, however, seizes upon the Supreme Court's statement in *Knauff v. Shaughnessy* regarding immigration laws that "[e]xecutive officers may be entrusted with the duty of specifying the procedures for carrying out the congressional intent." *Knauff*, 338 U.S. at 543. This language, however, refers only to the ability of Congress to delegate such authority to the Executive. It does not determine whether the judiciary should give special deference to the procedures and mechanisms of deportation that either promulgates.

Similarly, the Government seizes upon the statement in *Matthews v. Diaz* that "[i]n the exercise of its broad power over naturalization and immigration Congress regularly

makes rules that would be unacceptable if applied to citizens." 426 U.S. 67, 80 (1976). Many of these differences were pointed out by both the majority and dissent in *Harisiades v. Shaughnessy.* *See Harisiades v. Shaughnessy,* 342 U.S. 580, 586 603-04 n.10 (1952) (noting that "[t]he alien's right to travel temporarily outside the United States is subject to restrictions not applicable to citizens" and pointing out that non-citizens may be deported for lawful actions. (Douglas, J., dissenting)). The Court in *Diaz,* however, never indicated that Congress could enact any rule it deemed appropriate.

Non-deferential review does not begin and end with the Fifth Amendment. As long ago as 1896, the Supreme Court recognized that the Fifth and Sixth Amendments limited Congress from enforcing its powers over immigration. In *Wong Wing v. United States,* 163 U.S. 228 (1896), Congress had passed a statute requiring that "any . . . Chinese person, or person of Chinese decent, convicted and adjudged to be not lawfully entitled to be or remain in the United States" be "imprisoned at hard labor for a period not exceeding one year, and thereafter removed from the United States." *Id.* at 233-34. The government argued that this law was enacted under its plenary power over immigration. *Id.* at 234. As such, trials of aliens under this section could be conducted by an administrative, summary hearing. *Id.* at 236.[8]

While noting the broad powers enjoyed by the political branches to expel and exclude aliens, the Court held that such

---

[8]Given the political climate of the time and its positions in other cases involving Chinese immigrants, it is probable that the Court would have found the reasons for the law "facially legitimate and bona fide." In *The Chinese Exclusion Case,* a similar law, although substantive, was upheld. *See The Chinese Exclusion Case,* 130 U.S. at 589 (finding a law preventing Chinese laborers from entering the United States, even if they had previously lived there and had certificates authorizing their return, constitutional). Here, a procedural law was struck down. Accordingly, a higher standard of review must have been used.

carefully. They do not have to worry before they proceed with the task that a careless remark may be splashed across the next day's headlines." *Id.*

These first two concerns are magnified by the fact that deportees have no right to an attorney at the government's expense. Effectively, the press and the public may be their only guardian.

Third, after the devastation of September 11 and the massive investigation that followed, the cathartic effect of open deportations cannot be overstated. They serve a "therapeutic" purpose as outlets for "community concern, hostility, and emotions." *Richmond Newspapers*, 448 U.S. at 571. As the district court stated:

It is important for the public, particularly individuals who feel that they are being targeted by the Government as a result of the terrorist attacks of September 11, to know that even during these sensitive times the Government is adhering to immigration procedures and respecting individuals' rights . . . . And if in fact the Government determines that Haddad is connected to terrorist activity or organizations, a decision made openly concerning his deportation may assure the public that justice has been done.

*Detroit Free Press,* 195 F. Supp. 2d at 944.

Fourth, openness enhances the perception of integrity and fairness. "The value of openness lies in the fact that people not actually attending trials can have confidence that standards of fairness are being observed; the sure knowledge that *anyone* is free to attend gives assurance that established procedures are being followed and that deviations will become known." *Press-Enter.*, 464 U.S. at 508. The most stringent safeguards for a deportee "would be of limited worth if the public is not persuaded that the standards are being fairly enforced. Legitimacy rests in large part on public

### b.   *Public Access Plays a Significant Positive Role in Deportation Hearings*

Next, we turn to the "logic" prong, which asks "whether public access plays a significant positive role in the functioning of the particular process in question." *Press-Enter. II*, 478 U.S. at 8-9.   Public access undoubtedly enhances the quality of deportation proceedings. Much of the reasoning from *Richmond Newspapers* is also applicable to this context.

First, public access acts as a check on the actions of the Executive by assuring us that proceedings are conducted fairly and properly. *See Richmond Newspapers*, 448 U.S. at 569 (noting that public access assures that proceedings are conducted fairly, including discouraging perjury, the misconduct of participants, and decisions based on secret bias or partiality).   In an area such as immigration, where the government has nearly unlimited authority, the press and the public serve as perhaps the only check on abusive government practices.[15]

Second, openness ensures that government does its job properly; that it does not make mistakes. "It is better that many [immigrants] should be improperly admitted than one natural born citizen of the United States should be permanently excluded from his country." *Kwock Jan Fat*, 253 U.S. at 464.   "Congressional oversight hearings can prevent future mistakes, but they can do little to correct past ones. In contrast, openness at the hearings can allow mistakes to be cured at once." *Soc'y of Prof'l. Journalists*, 616 F. Supp. at 575-576.   Moreover, "[t]he natural tendency of government officials is to hold their meetings in secret. They can thereby avoid criticism and proceed informally  and less

---

[15] "Without publicity, all other checks are insufficient[.]" *Richmond Newspapers*, 448 U.S. at 569 (quoting 1 J. Bentham, Rationale of Judicial Evidence 524 (1827)).

powers were limited by the Fifth and Sixth Amendments: "But to declare unlawful residence within the country to be an infamous crime, punishable by deprivation of liberty and property, would be to pass out of the sphere of constitutional legislation, unless provision were made that the fact of guilt should first be established by a judicial trial." *Id.* at 237.

Although the question had never been addressed specifically, there is ample foundation to conclude that the Supreme Court would also recognize that non-citizens enjoy unrestrained First Amendment rights in deportation proceedings.  For example, in *Bridges v. Wixon*, 326 U.S. 135 (1945), a non-citizen was deported because of his allegiance to the Communist Party. *Id.* at 137.  The Court invalidated the deportation on statutory grounds. *Id.*  at 156-157.  A concurrence by Justice Murphy, however, noted that deportees had unqualified First Amendment rights in deportation hearings:

O]nce an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and Fifth Amendments and by the due process clause of the Fourteenth Amendment.   None of these provisions acknowledges any distinction between citizens and resident aliens.  They extend their inalienable privileges to all "persons" and guard against any encroachment on those rights by federal or state authority.

*Id.* at 161 (Murphy, J., concurring).  This statement has since been adopted by the full court. *See Hellenic Lines Ltd.*, 398 U.S. at 310 n.5 (1970); *see also Reno v. American-Arab Anti-Discrimination Committee,* 525 U.S. 471 (1999) (Ginsburg, J., concurring) (recognizing First Amendment restrictions on the political branches' authority over deportation).

Similarly, the Court seemed to acknowledge a First Amendment right in deportation hearings in *Harisiades v.*

*Shaughnessy*, 342 U.S. 580 (1952). Like *Bridges v. Wixon*, the deportees in *Harisiades* were deported for their allegiance to the Communist Party, which Congress had found advocated government overthrow by force or violence. *Harisiades*, 342 U.S. at 584. While upholding the statutes and the deportations against a First Amendment challenge, the Court held that threat of violence and force was not protected by the First Amendment. *Id.* at 592 (noting that the First Amendment "means freedom to advocate or promote Communism by means of the ballot box, but it does not include the practice or incitement of violence"). Even while not finding a protected First Amendment right, the Court seemed to acknowledge that the First Amendment operated in deportation proceedings.

More support for independent, non-deferential review of non-substantive immigration laws can be found in *INS v. Chada*, 462 U.S. 919 (1983). *Chada* involved a statute allowing a congressional veto over any decision by the Attorney General that allowed a deportable alien to remain in the United States. The Court held that the law violated the Presentment Clause. *See id.* at 959. The government, in part, argued that they were entitled to deference due to their plenary power over immigration. The Court, however, stated:

> The plenary authority of Congress over aliens under Art. I § 8, cl. 4, is not open to question, but what is challenged here is whether Congress has chosen a constitutionally permissible means of implementing that power. As we made clear in *Buckley v. Valeo*, 424 U.S. 1 (1976): "Congress has plenary authority in all cases in which it has substantive legislative jurisdiction . . . so long as the exercise of that authority does not offend some other constitutional restriction."

*Chada*, 462 U.S. at 940-41.

More recently, the Supreme Court has again applied non-deferential review to non-substantive immigration law. In

basic principles that the legislature shall appropriately determine the standards of administrative action and that in administrative proceedings of a quasi-judicial character the liberty and property of the citizen shall be protected by the rudimentary requirements of fair play. *These demand "a fair and open hearing,"* – essential alike to the legal validity of the administrative regulation and to the maintenance of public confidence in the value and soundness of this important governmental process. Such a hearing has been described as an "inexorable safeguard."

*Morgan v. United States,* 304 U.S. 1, 14-15 (1938) (citations omitted) (emphasis added).

Finally, to refute the history of open hearings, the government points to a single passage in a study about deportation of non-citizens to Europe during the 1920's and a single Second Circuit case, for the proposition that deportation hearings took place in a variety of settings, including prisons, hospitals, and homes. *See* J. Clark, *Deportation of Aliens from the United States to Europe* 363 (1931); *United States ex rel. Ciccerelli v. Curran*, 12 F.2d 394, 396 (2d Cir. 1926) (finding that deportation hearings may be held in prison). However, neither of these sources speak to the norm. Certainly, while these examples might have been exceptional cases, neither of these sources even hint that the public could not attend a hearing at a prison, hospital, or home. Certainly, one could imagine family and friends being present at some of these places. Finally, the study cited by the Government points out that members of Congress, like Plaintiff Conyers, sometimes attended, or sent representatives to, such hearings. *See* Clark, *supra* at 368.[14]

---

[14]At best, the Government's claimed "historical proof" shows only that in some cases, there may not be much historical record. This does not mean, however, that there was not a historical practice of one kind or the other. In such cases, it makes more sense to look to more recent practice, similar proceedings, and concentrate on the "logic" portion of the test.

punishment. *See First Amendment Coalition*, 784 F.2d at 473.

As stated earlier, to paraphrase the Supreme Court, deportation hearings "walk, talk, and squawk" very much like a judicial proceeding. Substantively, we look to other proceedings that have the same effect as deportation. Here, the only other federal court that can enter an order of removal is a United States District Court during sentencing in a criminal trial. *See* 8 U.S.C.A. § 1228(c) (2002). At common law, beginning with the Transportation Act of 1718, the English criminal courts could enter an order of transportation or banishment as a sentence in a criminal trial. *See generally* Javier Bleichmar, *Deportation as Punishment: A Historical Analysis of the British Practice of Banishment and its Impact on Modern Constitutional Law*, 14 GEO. IMMIGR. L.J. 115, 125 (1999) (citing A. ROGER EKRICH, BOUND FOR AMERICA: THE TRANSPORTATION OF BRITISH CONVICTS TO THE COLONIES 1718-1775 (1987)). As *Richmond Newspapers* discussed in great length, these types of criminal proceedings have historically been open. *Richmond Newspapers*, 448 U.S. at 564-74.

It bears note that the history of administrative proceedings is briskly evolving to embrace open hearings. *See* 3 Kenneth Culp Davis, *Administrative Law Treatise* § 14:13, at 58-61 (2d ed. 1980) ("The prevailing tendency [is] to open all hearings of a somewhat formal character, overriding interest in privacy and in confidentiality"). Thus, the "favorable judgment of experience" counsels that openness better serves formal administrative hearings. *See Richmond Newspapers,* 448 U.S. at 589*; see also Fitzgerald v. Hampton*, 467 F.2d 755, 766-67 (D.C. Cir. 1972) (holding that closing civil servant's termination hearing violated due process). As the Supreme Court aptly recognized in 1938:

The vast expansion of this field of administrative regulation in response to the pressure of social needs is made possible under our system by adherence to the

*Zadvydas v. Davis,* 533 U.S. 678 (2001), two non-citizens were being held indefinitely beyond the normal statutory-removal period of ninety days, because no country would accept them. A post-removal-period statute authorized such detention. The issue, however, was whether the post-removal statute authorized a detention indefinitely, or for a period reasonably necessary to secure removal. The language of the statute set no such limit. The Court read an implicit reasonableness limit into the statute to avoid "serious constitutional problems." *Id.* at 690. Significantly, the Court dismissed the government's argument that Congress's plenary power to create immigration law required deference to the political branches' decision-making. *Id.* at 699-700. The Court repeated the mantra that the plenary power was "subject to important constitutional limitations." *Id.* at 695 (citing *INS v. Chada*, 462 U.S. 919, 941-942 (1983); *The Chinese Exclusion Case*, 130 U.S. 581, 604 (1889)).

The Government correctly notes that the Court in *Zadvydas* twice indicated that it might be deferential in situations involving terrorism. *See id.* at 691, 696 ("noting that [t]he provision authorizing detention does not apply narrowly to 'a small segment of particularly dangerous individuals,' say suspected terrorists, but broadly to aliens ordered removed for many and various reasons, including tourist visa violations," and noting that "Neither do we consider terrorism or other special circumstances where special arguments might be made for forms of preventative detention and for heightened deference to the judgments of the political branches with respect to matters of national security."). However, nothing in *Zadvydas* indicates that given such a situation, the Court would defer to the political branches' determination of who belongs in that "small segment of particularly dangerous individuals" without judicial review of the individual

circumstances of each case,[9] something that the Creppy directive strikingly lacks. The Court repeated the importance of strong procedural protections when constitutional rights were involved: "[T]he Constitution may well preclude granting 'an administrative body the unreviewable authority to make determinations implicating fundamental rights.'" *See id.* at 692 (quoting *Superintendent, Mass. Corr. Inst. at Walpole v. Hill*, 472 U.S. 445 (1985) ( O'Connor, J.)).

Importantly, the Creppy directive does not apply to "a small segment of particularly dangerous" information, but a broad, indiscriminate range of information, including information likely to be entirely innocuous. Similarly, no definable standards used to determine whether a case is of "special interest" have been articulated. Nothing in the Creppy directive counsels that it is limited to "a small segment of particularly dangerous individuals." In fact, the Government so much as argues that certain non-citizens known to have no links to terrorism will be designated "special interest" cases. Supposedly, closing a more targeted class would allow terrorists to draw inferences from which hearings are open and which are closed.

While we sympathize and share the Government's fear that dangerous information might be disclosed in some of these hearings, we feel that the ordinary process of determining whether closure is warranted on a case-by-case basis sufficiently addresses their concerns. Using this stricter standard does not mean that information helpful to terrorists will be disclosed, only that the Government must be more targeted and precise in its approach. Given the importance of the constitutional rights involved, such safeguards must be

---

[9]It should also be noted that this language concerning terrorism was strictly dicta. In *New York Times v. United States*, the Court applied no deferential review to the Government's actions when faced with a national security threat. *See New York Times,* 403 U.S. 713.

evidence is credible and the weight to be given that evidence shall be within the sole discretion of the Attorney General."); 8 U.S.C. §1182 (a)(9)(B)(v)(2002) ("The Attorney General has sole discretion to waive clause (i)"). To the extent that their actions were ambiguous, the Supreme Court has repeated "the long standing principle of construing any lingering ambiguities in deportation statutes in favor of the alien." *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 459 (1987) (citing *INS v. Errico*, 385 U.S. 214, 225 (1966)); *see also Costello v. INS*, 376 U.S. 120, 128 (1964); *Fong Haw Tan v. Phelan*, 333 U.S. 6, 10 (1948).

Moreover, the history of immigration law informs Congress's legislation. Open hearings, apart from their value to the community, have long been considered to advance fairness to the parties. *See generally Richmond Newspapers*, 448 U.S. 555. Additionally, Congress has long been aware that deportees are constitutionally guaranteed greater procedural rights than those excluded upon initial entry. *See, e.g., Ex rel. Mezei*, 345 U.S. at 212 (reviewing this history). Therefore, Congress likely legislated key differences between both procedures accordingly.

Next, relying on *Capital Cities Media, Inc.*, the Government impermissibly expands the relevant inquiry by arguing that there was no common law right of access to administrative proceedings. First, this argument ignores the fact that the modern administrative state is an entity unknown to the Framers of the First Amendment. This argument also fails to recognize the evolving nature of our government. Administrative proceedings come in all shapes and sizes. To the extent that we look to similar proceedings, we should look to proceedings that are similar in form and substance. This was the approach taken by the Third Circuit in *The First Amendment Coalition*. In that case, when analyzing the history prong of the test, the Third Circuit compared an administrative disciplinary board's function to that of a grand jury because both could only recommend, not impose,

Nonetheless, deportation proceedings historically have been open.  Although exceptions may have been allowed, the general policy has been one of openness.  The first general immigration act was enacted in 1882.  *See Kleindienst,* 408 U.S. at 761.  Repeatedly, Congress has enacted statutes closing exclusion hearings.  *See e.g.,* Treasury Department, Immigration Laws and Regulations 4 (Washington D.C., Government Printing Office 1893); Act of March 3, 1903 § 25 (Ch. 1012, 32 Stat. 1213) (requiring exclusion hearings to be held "separate and apart" from the public); 1952 Immigration and Nationality Act, 66 Stat. 163, Section 163 (same).  None of these statutes, however, has ever required closure of deportation hearings.  Since 1965, INS regulations have explicitly required deportation proceedings to be presumptively open.  *See* 8 C.F.R. § 3.27.  Since that time, Congress has revised the Immigration and Nationality Act at least 53 times without indicating that the INS had judged their intent incorrectly.  *See* United States Dept. of Justice, Immigration and Naturalization Service, *Immigration and Naturalization Legislation from the Statistical Yearbook*, (last m o d i f i e d  0 5 / 2 8 / 2 0 0 2 )  < h t t p : //www.ins.usdoj.gov/graphics/aboutins/statistics/legishist/ index.htm> ("*Statistical Yearbook*").

The Government argues that the history of explicitly closing exclusion hearings, while not specifying that deportation hearings be closed, does not show that Congress intended deportation hearings to be open.  Instead, the Government contends, this demonstrates that Congress took the INS's discretion away for exclusion hearings and specifically gave them discretion to open or close deportation hearings.  We find the Government's reading unpersuasive.  Having explicitly closed exclusion hearings, it would have been easy enough for Congress expressly to state that the Attorney General had such discretion with respect to deportation hearings.  But it did not.  The Immigration and Nationality Act is replete with examples where discretion is specifically delegated to the Attorney General.  *See*, *e.g.*, 8 U.S.C. § 1154 (a)(1)(J) (2002) ("The determination of what

vigorously guarded lest the First Amendment turn into another balancing test.  In the words of Justice Black:

> The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment. The guarding of military and diplomatic secrets at the expense of informed representative government provides no real security for our Republic.

*New York Times*, 403 U.S. at 719 (Black, J., concurring).

The Government cites other cases that it claims support its view that even procedural immigration laws are entitled to a deferential standard of review.  However, those cases involve either substantive immigrations laws determining who gets deported, *see Almario v. Attorney General*, 872 F.2d 147 (6th Cir. 1989) (requiring deportation of persons married during their deportation proceedings), or non-substantive immigration laws where no constitutional right was recognized.  *See Reno v. Flores*, 507 U.S. 292 (1993) (finding that the authority of the Executive to determine whether, and on what terms, a detained non-citizen should be released pending a hearing implicates no fundamental right or other Constitutional protection).  Here, however, we are faced with a strictly non-substantive regulation that could impact greatly upon a First Amendment right.

Other courts of appeals have similarly held that courts may review immigration procedures with greater scrutiny than substantive immigration decisions or laws.  *See Hoang v.Comfort*, 282 F.3d 1247, 1257-58 (10th Cir. 2002); *Zamora-Garcia v. INS*, 737 F.2d 488, 490-92 (5th Cir. 1984); *see also Rodriguez-Reyes v. INS*, 983 F.2d 1068 (6th Cir. 1993) (per curiam).

    c.   *The Government's Remaining Argument*

Finally, the Government argues that this distinction between substantive and non-substantive immigration laws

"fails to acknowledge that procedural requirements often reflect, and encompass, substantive choices" and that it "makes no sense." *See* Gov't Brief at 25. This contention strikes us as profoundly undemocratic in that it ignores the basic concept of checks and balances. More fundamentally, though, were the political branches' decisions not subject to certain basic procedural requirements, the government could act arbitrarily and behind closed doors, leaving unsettled the lives of thousands of immigrants. Even though the political branches may have unfettered discretion to deport and exclude certain people, requiring the Government to account for their choices assures an informed public -- a foundational principle of democracy.

Undoubtedly, however, where a constitutional right is not implicated, the political branches retain unfettered discretion to determine both substantive and non-substantive immigration policy and laws. *See, e.g., Galvan v. Press*, 347 U.S. 522, 531 (1954) (finding that the *Ex Post Facto* Clause, applying only to criminal cases, does not apply in deportation cases, being civil in nature). The Creppy directive, however, is strictly non-substantive, and if a First Amendment right of access exists, the Government must show that it is a narrowly tailored means of advancing a compelling interest. *See Globe Newspaper,* 457 U.S. at 606.

### 2.    APPLICABILITY OF *RICHMOND NEWSPAPERS*

We next consider whether the First Amendment affords the press and public a right of access to deportation hearings. The Newspaper Plaintiffs argue that the right of access should be governed by the standards set forth in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), and its progeny. The Government, on the other hand, contends that *Richmond Newspapers* and its progeny are limited to judicial proceedings, and therefore, the standards articulated in these cases do not apply to deportation hearings, which are administrative proceedings. According to the Government, review of claims of access to administrative proceedings are

Justice Brennan's formulation); *Globe Newspapers,* 457 U.S. at 605 (same). Specifically, Justice Brennan opined:

First, the case for a right of access has special force when drawn from an enduring and vital tradition of public entree to particular proceedings or information. *Cf. In re Winship*, 397 U.S. 358, 361-362 (1970). Such a tradition commands respect in part because the Constitution carries the gloss of history. *More importantly, a tradition of accessibility implies the favorable judgment of experience*. Second, the value of access must be measured in specifics. Analysis is not advanced by rhetorical statements that all information bears upon public issues; *what is crucial in individual cases is whether access to particular government process is important in terms of that very process.*

*Richmond Newspapers*, 448 U.S. at 589 (Brennan, J., concurring) (emphasis added). Therefore, although historical context is important, a brief historical tradition might be sufficient to establish a First Amendment right of access where the beneficial effects of access to that process are overwhelming and uncontradicted. *See id.* Accordingly, the Supreme Court has called both prongs of the test "complimentary considerations." *Press-Enter. II*, 478 U.S. at 8. This comports with the Court's view that the First Amendment concerns "broad principles," *Globe Newspapers,* 457 U.S. at 604, applicable to contexts not known to the Framers. *See, e.g., Erznoznik v. Jacksonville*, 422 U.S. 205 (1975) (applying First Amendment protection to drive-in movie theaters). However, we are mindful that "[a] historical tradition of at least some duration is obviously necessary, . . . [or] nothing would separate the judicial task of constitutional interpretation from the political task of enacting laws currently deemed essential." *In re The Reporters Comm. for Freedom of the Press,* 773 F.2d 1325, 1332 (D.C. Cir. 1985) (Scalia, J.).

### a.   *Deportation Proceedings Have Been Traditionally Accessible to the Public*

"[B]ecause a 'tradition of accessibility implies the favorable judgment of experience,' *Globe Newspaper,* 457 U.S. at 605 (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 589 (1980) (Brennan, J., concurring)), we . . . consider . . . whether the place and process have historically been open to the press and general public." *Press-Enter. II,* 478 U.S. at 8.

The parties first dispute whether this inquiry requires a significantly long showing that the proceedings at issue were historically open, such as a common law tradition. The government cites *Richmond Newspapers* for the proposition that the tradition of open hearings must have existed from the time "when our organic laws were adopted," presumably at the adoption of the Bill of Rights.  *See Richmond Newspapers,* 448 U.S. at 569.

The Supreme Court effectively silenced this argument in *Press-Enterprise II*, where the Court relied on exclusively post-Bill of Rights history in determining that preliminary hearings in criminal cases were historically open. *See Press-Enter. II,* 478 U.S. at 10-12. Courts of Appeals have similarly not required such a showing. *See, e.g., United States v. Simone*, 14 F.3d 833, 842 (3d Cir. 1994) (finding First Amendment right of access despite no history of such); *Cal-Almond., Inc.,* 960 F.2d 105, 109 (finding history of access to be determined by reviewing current state statutes); *Applications of Nat'l Broad. Co., Inc. v. Presser,* 828 F.2d 340, 344 (6th Cir. 1987) (finding First Amendment right of access while reviewing history from 1924-1984).

Justice Brennan's formulation of the "experience" prong of the test in his *Richmond Newspapers* concurrence,  adopted as the  prevailing view of how to approach the issue, speaks on this point.  *See Press-Enter. II*, 478 U.S. at 8 (adopting

governed by the more deferential standard articulated in *Houchins v. KQED*, Inc., 438 U.S. 1 (1978).   The Government also argues that even if the standard articulated in *Richmond Newspapers* and its progeny is the appropriate test, the Newspaper Plaintiffs cannot demonstrate a right of access to deportation hearings by the standards articulated therein.

We do not agree that the standard articulated in *Houchins* is the applicable standard for reviewing First Amendment claims of access to administrative proceedings. First, we find both the issues and facts in *Houchins* distinguishable from those present in this case. Second, assuming without deciding that *Houchins* may be applicable to administrative proceedings, we do not find it applicable to administrative proceedings that exhibit substantial quasi-judicial characteristics.

### a.   *Richmond Newspapers is a Test of General Applicability*

First, *Houchins* is not the applicable standard to resolve the First Amendment claim of access now before us. The issue before the Court in *Houchins*, decided two years before *Richmond Newspapers*, was "whether the news media have a constitutional right of access to a county jail, *over and above that of other persons*, to interview inmates and make sound recordings, films and photographs for publication and broadcasting by newspapers, radio and television." 438 U.S. at 3. (emphasis added). Here, the Newspaper Plaintiffs do not claim a "special privilege of access" to the deportations hearings.  Rather, the Newspaper Plaintiffs simply request that they be able to attend the hearings on equal footing with the public.

Next, *Houchins* rested its holding on the Court's interpretation of the press clause, *see* 438 U.S. at 12, a First Amendment clause distinct from the speech clause, which is here at issue.  Moreover, as noted by Justice Stevens in his

concurring opinion in *Richmond Newspapers*, *Houchins* represented a plurality opinion of the Court,[10] and as such, the conclusion that the First and Fourteenth Amendments do not guarantee the public a right of access to information generated or controlled by the government was neither accepted nor rejected by a majority of the Court. *Richmond Newspapers*, 448 U.S. at 583. (Stevens, J., concurring). Additionally, although numerous cases have often cited the policy reasons underlying the Court's plurality opinion in *Houchins*, we question the vitality of the standard articulated in *Houchins*, at least with respect to cases such as the one presently before us. The *Richmond Newspapers's* two-part "experience and logic" test sufficiently addresses all of the *Houchins* Court's concerns for the implications of a constitutionally mandated general right of access to government information. And in repeatedly applying *Richmond Newspapers's* two-part "experience and logic" test to assess the merits of cases claiming First Amendment access rights to different government proceedings, it is clear that the Court has since moved away from its position in *Houchins* and recognizes that there is a limited constitutional right to some government information.

We note that outside of the trial phases of criminal proceedings, many cases have consistently applied the two-part "experience and logic" test articulated in *Richmond Newspapers* and its progeny. *See, e.g., Press-Enter. II*, 478 U.S. at 13 (preliminary hearings)*; Press-Enter. I,* 464 U.S. at 501-04, (voir dire examination and juror selection); *United States v. Simone,* 14 F.3d 833, 842 (3d Cir. 1994) (post-trial examination of juror for potential misconduct)*; United States v. Smith,* 787 F.2d 111, 116 (3d Cir. 1986) (transcripts of sidebars or chambers conferences concerning evidentiary rulings); *United States v. Criden,* 675 F.2d 550, 554 (3d Cir.

---

[10]In *Houchins*, Justices Marshall and Blackmun were unable to participate in the case. The Court voted 4-3, with Justice Stewart concurring only in the judgment. *Houchins*, 438 U.S. at 16-19.

investigation). Notably, the one case cited by the Government involving access to what on the surface appears to be an adjudicative proceeding, *First Amendment Coalition v. Judicial Inquiry & Review Bd.*, 784 F.2d 467 (3d Cir. 1986) (en banc), is really at its core also investigatory. This much is acknowledged by the court in *First Amendment Coalition* when it concludes that the proceedings of the judicial board of review were most similar to a grand jury investigation. 784 F.2d at 473. Nonetheless, except for *ACLU v. Mississippi*, where access to personal records from an illegal government investigation was at issue, *First Amendment Coalition*, together with the remaining cases cited by the Government, applied the *Richmond Newspapers* two-part test.

Finally, although *First Amendment Coalition* and *Capital Cities Media* recognize *Houchins* as holding that there is no *general* right of access to government information, the line of cases from *Richmond Newspapers* to *Press-Enterprise II* recognize that there is in fact a *limited* constitutional right to *some* government information and also provide a test of general applicability for making that determination. Accordingly, we must assess whether the Newspaper Plaintiffs enjoy a First Amendment right of access to deportation hearings under the two-part test of *Richmond Newspapers* and its progeny.

### 3.   THE TWO-PART *RICHMOND NEWSPAPERS* TEST

Under the two-part "experience and logic" test from *Richmond Newspapers*, we conclude that there is a First Amendment right of access to deportation proceedings. Deportation hearings, and similar proceedings, have traditionally been open to the public, and openness undoubtedly plays a significant positive role in this process.

government, *see* 8 C.F.R. § 240.10, the immigration judge, in keeping with his impartial role, is not required to advise the non-citizen as to remedies that are not apparent. *See, e.g., Ghaelian v. INS.*, 717 F.2d 950, 953 (6th Cir. 1983).

The foregoing demonstrates that there are many similarities between judicial proceedings and deportation proceedings. It is clear that removal proceedings are decidedly adversarial and, thus, more like the proceedings in *South Carolina State Ports Authority*. and less like those in *Miami University* and *Sims*. The inapplicability of certain rules of evidence or civil procedure does nothing to alter our conclusion that this system of administrative adjudication closely parallels the judicial model of decision-making. Many deportation proceedings are unremarkable in that the respondent is removable and either may be clearly ineligible for any relief or the only possible remedy may be voluntary departure. However, many other deportation proceedings involve either a contest with respect to deportability or contested or non-contested application for relief, or both.

We are not convinced that the *Houchins* test should be applied to deportation hearings, being exceedingly formal and adversarial. The Government rests its argument regarding the inapplicability of the *Richmond Newspapers* two-part test to deportation proceedings on cases that we find readily distinguishable. All the cases cited by the Government concern purported rights of access to, or disclosure of, government-held *investigatory* information and *not* access to information relating to a governmental *adjudicative* process, which is at issue here. *See ACLU v. Mississippi*, 911 F.2d 1066, 1071-72 (5th Cir. 1990) (access to records of illegal investigations by state commission); *Calder v. IRS*, 890 F.2d 781, 783-84 (5th Cir. 1989) (access to records of tax investigation); *Capital Cities, Media Inc. v. Chester*, 797 F.2d 1164, 1167 (3d Cir. 1986) (en banc) (access to records of environmental agency's investigation); *Combined Communications Corp. v. Boger*, 689 F. Supp. 1065, 1065 (W.D. Okla. 1988) (access to records of NCAA

1982) (pretrial suppression, due process and entrapment hearings).

The *Richmond Newspapers* two-part test has also been applied to particular proceedings outside the criminal judicial[11] context, including administrative proceedings. *See, e.g., United States v. Miami Univ.*, 294 F.3d 796, 824 (6th Cir. 2002) (university's student disciplinary board proceedings); *Brown & Williamson Tobacco Corp. v. Fed. Trade. Comm'n*, 710 F.2d 1165, 1177-79 (6th Cir. 1983) (civil action against administrative agency); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059 (3d Cir.1984) (civil trial); *Whiteland Woods, L.P. v. West Whiteland*, 193 F.3d 177, 181 (3d Cir.1999) (municipal planning meeting); *Cal-Almond, Inc. v. United States Dept. of Agric.*, 960 F.2d 105, 109 (9th Cir.1992) (agriculture department's voters list); *Society of Prof. Journalists v. Sec'y of Labor*, 616 F. Supp. 569, 574 (D.Utah 1985) (administrative hearing), *vacated as moot*, 832 F.2d 1180 (10th Cir. 1987). Thus, we reject the Government's assertion that a line has been drawn between judicial and administrative proceedings, with the First Amendment guaranteeing access to the former but not the latter. "[T]he First Amendment question cannot be resolved solely on the label we give the event, i.e., 'trial' or otherwise." *Press-Enterprise II*, 478 U.S. at 7. Moreover, the Government cites no cases explicitly stating such a categorical distinction – that the political branches of

---

[11] The Supreme Court has not yet had occasion to address whether there is a First Amendment right to attend civil proceedings, but a number of circuits, including ours in *Brown and Wiiliamson*, have addressed the issue. All have agreed the governing test is the two-part *Richmond Newspapers* test and have further agreed that the press and public have a First Amendment right to attend civil proceedings under that test. *See, e.g., Rushford v. New Yorker Magazine*, 846 F.2d 249, 253 (4th Cir. 1988); *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1061 (3d Cir. 1984); *Westmoreland v. CBS*, 752 F.2d 16, 23 (2d Cir. 1984); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1308; *Newman v. Graddick*, 696 F.2d 796, 801 (11th Cir. 1983); *see also In re Iowa Freedom of Info. Council*, 724 F.2d 658, 661-63 (8th Cir. 1983).

government are completely immune from the First Amendment guarantee of access recognized in *Richmond Newspapers*. On the contrary, we believe that there is a limited First Amendment right of access to certain aspects of the executive and legislative branches. *See Richmond Newspapers*, 448 U.S. at 584 ("[T]he First Amendment protects the public and the press from abridgment of their rights of access to information about the operation of *their government, including the Judicial Branch* . . . .") (Stevens, J., concurring) (emphasis added). While the Government is free to argue that the particular historical and structural features of certain administrative proceedings do not satisfy the *Richmond Newspapers* two-part test, we find that there is no basis to argue that the test itself does not apply.

   b.   *If the Houchins Test is Still Good Law, It Does Not Apply to Formal, Quasi-Judicial Proceedings, Like Deportation Proceedings*

   Finally, to the extent that the standard in *Houchins* remains good law, we do not find *Houchins* applicable to the facts of the present case. Here, the Newspaper Plaintiffs seek access to a demonstrably quasi-judicial government administrative proceeding normally open to the public, as opposed to *Houchins*, where the plaintiffs sought access to a government facility normally restricted to the public.[12]

   Deportation hearings, as quasi-judicial proceedings, are fundamentally different than a prison facility. "[T]he distinction between trials and other official proceedings is not necessarily dispositive, or even important, in evaluating First Amendment issues." *Press-Enterprise I*, 464 U.S. at 516

---

[12]The lack of alternative means for the public to access the hearings also informs our conclusion. The Court in *Houchins* noted at some length that alternative means existed for gathering information about prison conditions. *Houchins*, 438 U.S. at 12-16. Here, there exist no alternative means for the media to learn about deportation proceedings in special interest cases.

   In addition to a non-citizen's ability to defend against removability and to seek remedies, a respondent in a removal hearing is afforded some rights that go to the fundamental fairness of these proceedings. Most importantly, a respondent has the right to seek habeas corpus relief. 28 U.S.C. § 2241(c)(3); *Zadvydas*, 533 U.S. at 687. A respondent also has the right to be represented by counsel of his own choosing at no expense to the government. *See* 8 C.F.R. § 240.3. The Supreme Court has stated that: "We are mindful that the complexity of immigration procedures, and the enormity of the interests at stake, make legal representation in deportation proceedings especially important." *Ardestani v. INS*, 502 U.S. 129, 138 (1991). Furthermore, courts, emphasizing the importance of counsel at deportation proceedings, will not lightly find a waiver of that right. *See, e.g., Montilla v. INS.*, 926 F.2d 162, 169 (2d Cir. 1991) (if regulations concerning right to counsel are violated, one does not have to show prejudice; here the right to counsel was never waived and waiver must be clear and cannot be inferred). In addition to the non-citizen's right to retain counsel, a deportee also has a right to be present at the hearing, unless he voluntarily absences himself after the hearing has commenced. The non-citizen also has an opportunity to examine the evidence against him, present evidence on his behalf, and cross-examine witnesses. *See* 8 U.S.C. § 1229a(b)(4). The government, on its part, is represented by a trial attorney, often a general attorney from the Immigration and Naturalization Services. *See* 8 C.F.R. § 240.2.

   Removal proceedings are presided over by immigration judges. *See* 8 U.S.C. § 1229a. A presiding immigration judge cannot have participated in the same case in an investigative or prosecutorial role. *See, e.g., Marcello v. Bonds*, 349 U.S. 302, 311 (1955); *United States v. Benitez-Villafuerte, 186 F.3d 651 (5th Cir.1999) cert. denied, 528 U.S.1097 (2000)*. In fact, while the immigration judge must advise the respondent of his right to examine and object to evidence used against him, present evidence on his own behalf, and cross-examine witnesses presented by the

if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any) . . . . " *See* 8 U.S.C. § 1229a(a)(1). In a deportation proceeding, the government bears the burden of establishing its allegations by "clear, and convincing evidence," *see* 8 C.F.R. § 240.8; *Kuhali v. Reno*, 266 F.3d 93, 106 (2d Cir. 2001), and removability must be based on reasonable, substantial and probative evidence. *See* 8 C.F.R. § 240.8. We have stated, generally, that "[o]nce the INS has established a *prima facie* case of deportability, 'the burden of going forward to produce evidence of nondeportability then shifts to the [the detainee].'" *Zaitona v. INS*, 9 F.3d 432, 434 (6th Cir. 1993) (citing *Cabral-Avila v. INS*, 589 F.2d 957, 959 (9th Cir. 1978)).

In turn, a respondent may interpose affirmative defenses, for example legalization, *see, e.g., Martinez-Montoya v. INS*, 904 F.2d 1018 (5th Cir. 1990), or seek discretionary relief that will provide for his continued stay in the country.[13] Where the respondent in a deportation proceeding seeks discretionary relief, he has the burden of both establishing that he is statutorily eligible for the requested relief and that he merits a favorable exercise of agency discretion. *See* 8 C.F.R. § 242.17(e); *Opie v. INS*, 66 F.3d 737, 739 (5th Cir. 1995). Viewed as such, a removal hearing really consists of two parts: determining removability and considering applications for discretionary relief. When removability is not contested, the non-citizen concedes removability and applications for discretionary relief are then considered. However, when removability is contested, discretionary relief becomes relevant only if removability is found.

---

[13] Available discretionary relief include the following: (i) adjustment of status, *see* 8 U.S.C. § 1255; (ii) cancellation of removal (pursuant to IIRIRA of 1996, this procedure replaces and substantial alters two previous provisions – § 212(c) waiver and suspension of deportation), *see* 8 U.S.C. § 1229b; (iii) asylum, *see* 8 U.S.C. § 1158; voluntary departure, *see* 8 U.S.C. § 1229c; and (iv) registry, *see* 8 U.S.C. § 1259.

(Stevens, J., concurring). Drawing sharp lines between administrative and judicial proceedings would allow the legislature to artfully craft information out of the public eye.

A deportation proceeding, although administrative, is an adversarial, adjudicative process, designed to expel non-citizens from this country. "[T]he ultimate individual stake in these proceedings is the same as or greater than in criminal or civil actions." *See N. Media Jersey Media Group*, *Inc. v. Ashcroft*, 205 F. Supp. 2d 288, 301 (D.N.J. 2002). "[D]eportation can be the equivalent of banishment or exile," *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947), and the Court has taken note of the "drastic deprivations that may follow when a resident of this country is compelled by our [g]overnment to forsake all the bonds formed here and go to a foreign land where he often [may] have no contemporary identification." *Woodby v. INS*, 385 U.S. 276, 285 (1966). Moreover, "[t]hough deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." *Bridges*, 326 U.S. at 154. As such, "[t]hat deportation is a penalty--at times a most serious one--cannot be doubted." *Id.* at 154.

Two recent Supreme Court cases and one of our recent decisions that turned on the precise substance of particular administrative proceedings are instructive. The holdings in these cases did not rest on the simple determination that the proceedings were administrative. Rather, in each of these cases, the courts looked to the adjudicative characteristics of the proceedings in reaching their final decisions.

First, in *Sims v. Apfel*, 530 U.S. 103 (2000), the Court held that a social security claimant who exhausted her administrative remedies was not required to exhaust issues in a request for review by the Appeals Council of the Social Security Agency in order to preserve judicial review of those issues. *Id.* at 110-11. The Court noted that the ordinary waiver rule as applied to administrative agencies "is an

analogy to the rule that appellate courts will not consider arguments not raised before trial courts." *Id.* at 108. The Court, however, concluded that the proceedings before the administrative agency, unlike those before trial courts, were not adversarial proceedings and thus found the reasons for issue exhaustion in these proceedings much weaker. *Id.* The Court also concluded that "[s]ocial security proceedings [were] inquisitorial rather than adversarial." *Id.* at 110-11. The Court noted that in Social Security Agency proceedings, it was the administrative law judge's duty to investigate the facts and develop the arguments both for and against granting benefits, and that the Appeal Council's review was similarly broad. *Id.* at 111. As further support for its conclusion regarding the investigative nature of the proceedings, the Court cited the fact that the commissioner for the Social Security Agency has no representative before the administrative law judge or the Appeals Council to oppose the claim for benefits. *Id.*

Next, in *Federal Maritime Commission v. South Carolina State Ports Authority*, 122 S.Ct. 1864 (2002), the Court held that state sovereign immunity bars an administrative agency from adjudicating complaints filed by a private party against a non-consenting state because it concluded that such administrative proceedings bore a striking resemblance to civil litigation. *Id.* at 1873-75. The Court reached this conclusion although it assumed that the proceedings before the Federal Maritime Commission were not "judicial proceedings." *Id.* at 1871. Nevertheless, the Court noted that the parties did not dispute the appellate court's characterization that the Federal Maritime Commission proceedings "walk[ed], talk[ed], and squawk[ed] very much like . . . lawsuit[s]." *Id.* at 1873 (quoting *S.C. State Ports Auth. v. Fed. Mar. Comm'n*, 243 F.3d 165, 174 (4th Cir. 2001)). The Court also noted that the parties did not deny that the proceedings exhibited the similarities between administrative adjudications and trial court proceedings, which the Court had found critical to its decision in *Butz v.Economou*, 438 U.S. 478 (1978), where it held that

administrative law judges share the same absolute immunity from suits as do Article III judges. *S.C. State Ports Auth.,* 243 F.3d at 1873.

Finally, in *United States v. Miami University*, 294 F.3d 797, 824 (6th Cir. 2002), we held that there was no First Amendment right to access a university's student disciplinary board proceedings. Like the Supreme Court in *Apfel* and *South Carolina State Ports Authority*, we too inquired into the substance of the questioned administrative proceedings. *Id.* at 822-824. We rejected the intervening newspaper's contention that there was a First Amendment right of access to the university's student disciplinary board proceedings because the proceedings adjudicated criminal matters to which the press and general public historically enjoyed access. *Id.* at 821. We disagreed with the newspaper's analogy to judicial criminal proceedings because we noted that student disciplinary proceedings were often not conducted in accordance with the cherished judicial traditions embodying the basic concepts of fair play. *Id.* at 822. Specifically, we noted that "student disciplinary proceedings do not 'afford the student the opportunity to secure counsel, to confront and cross-examine witnesses supporting the charge, or to call his own witnesses to verify his version of the incident.'" *Id.* (quoting *Gross v. Lopez*, 419 U.S. 565, 583 (1975)).

By contrast, a review of the procedural rules applicable in deportation proceedings confirms that deportation proceedings bear a strong resemblance to judicial trials. Consistent with the adversarial nature of judicial proceedings, a deportation proceeding is commenced with a "Notice to Appear," *see* 8 C.F.R. § 239.1, a charging document or complaint-like pleading, which vests jurisdiction with the immigration court. *See* 8 C.F.R. § 3.14. This document must contain information sufficient to put the non-citizen on notice of the charges against him. *See* 8 C.F.R. § 3.15. Similar to a complaint in a civil action, the immigration act provides that the Notice to Appear "shall be given in person to the alien (or,